UNITED STATES of America,
Plaintiff–Appellee,

v.

Carl SUTTON, Jr., et al.,
Defendants–Appellants.

Nos. 78–5134–5–6–7–8–9–41–2–3
and 78–5074.

United States Court of Appeals,
Sixth Circuit.

Nov. 7, 1979.

ORDER

v.

Carl SUTTON, Jr., Joseph Spinoza Elkins, Dyeatra Ann Carter, Edwin Arthur Adams, Otis Hensley, Prince Albert Rankin, Samuel Lee Harris, Charles Edward Craven, Viola Holmes, Defendants-Appellants.

Nos. 78–5134 to 78–5139 and 78–5141 to 78–5143.

United States Court of Appeals,
Sixth Circuit.

Argued April 2, 1980.

Decided Dec. 3, 1980.

Eugene D. Smith, Cincinnati, Ohio (Court-appointed), for defendant-appellant in No. 78–5134.

James ·C. Cissell, U. S. Atty., Terry W. Lehmann, Asst. U. S. Atty., Cincinnati, Ohio (David B. Smith, Atty., U. S. Dept. of Justice, Washington, D. C., of counsel), for plaintiff-appellee in all cases.

James R. Willis, Willis, Whitehead, Character, Adrine, Childs, Blackwell & Davison, Cleveland, Ohio, for defendants-appellants in Nos. 78–5135 and 78–5136.

John Carson, Cleveland, Ohio, for defendant-appellant in No. 78–5136.

Philip L. Pleska, Lebanon, Ohio (Court-appointed), for defendant-appellant in No. 78–5137.

James D. Ruppert, Franklin, Ohio (Court-appointed), for defendant-appellant in No. 78–5138.

Calvin W. Prem, Cincinnati, Ohio (Court-appointed), for defendant-appellant in No. 78–5139.

Andrew B. Dennison, Batavia, Ohio (Court-appointed), for defendant-appellant in No. 78–5141.

Henry E. Sheldon, Cincinnati, Ohio (Court-appointed), for defendant-appellant in No. 78–5142.

Ronald A. Lipez, Cincinnati, Ohio (Court-appointed), for defendant-appellant in No. 78–5143.

Before EDWARDS, Chief Judge, and WEICK, LIVELY, ENGEL, KEITH, MERRITT, BROWN, KENNEDY, BOYCE F. MARTIN, Jr., and JONES, Circuit Judges, sitting En Banc.

EDWARDS, Chief Judge.

This appeal has been heard en banc before the United States Court of Appeals for the Sixth Circuit. The case was originally heard by a three-judge panel of this court which reversed the convictions of the appel-lants involved herein by a 2–1 vote. A motion for rehearing en banc filed by the United States was granted by majority vote of the full court.

## I. THE TITLE IX "ENTERPRISE" ISSUE

### A. Introduction

The principal issue posed in this case is whether or not a major criminal statute, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961 *et seq.* (1976), adopted by Congress after lengthy consideration over a period of nearly 20 years, should be interpreted by the courts by changing the single word "enterprise" (used repeatedly therein without adjectives) to mean "ostensibly legitimate enterprise." The basic argument is that Congressional concern about the impact of organized crime and racketeering, upon legitimate businesses was clearly demonstrated in Congressional hearings and reports which preceded the adoption of this statute in 1970. Therefore, appellants reason, this statute must be construed to be applicable only in cases where the criminal activity involved is shown to be "ostensibly legitimate."

Appellants have not pointed to any language in the statute itself which supports their contention. On the contrary, they rely entirely upon implications which they find in legislative history and certain canons of statutory construction to argue for this judicial amendment.

We believe, however, that the statute itself makes plain that Congress intended to bring the full force of federal law enforcement into the effort to destroy organized crime and that it had no intention of limiting the federal effort to just those "ostensibly legitimate" enterprises which organized crime might use.

The cardinal rule of statutory interpretation is that the statute should be interpreted by the courts as written, unless it contains an ambiguity. As we will show in Section III of this opinion, we find no ambiguity in the term "enterprise" as used in

the statute. Congress recognized that the illegitimate enterprises of organized crime which it was concerned about would frequently make use of or subvert or seek to dominate otherwise lawful enterprises to a greater or lesser degree, and deliberately employed the term "enterprise" without qualification.

Congress' deep concern with this problem is exemplified in the history of the extensive hearings of the Special Senate Committee to Investigate Organized Crime in Interstate Commerce in the years 1950 and 1951. In these years Senator Kefauver and his associates conducted hearings on organized crime in all major cities in the nation exposing to public view for the first time the successful operation of many forms of racketeering. The results of the Kefauver investigations were such as to show Congress that in most major population centers illegal activities such as gambling, prostitution, loansharking, fencing and drug traffic were under the domination of organized crime through the employment of intimidation, murder and corruption. The impact of these revelations did not, however, arouse state and local governments to take effective measures against organized crime.

When in the '60's Congress turned its attention again to this problem, the records of the Permanent Subcommittee on Investigations of the Committee on Government Operations, 1963–1970, show clearly that Senator McClellan and his associates found that criminal organizations functioning on an interstate basis were able to evade, avoid, or, in some cases, corrupt the 50,000 separate and independent police departments of the United States to a degree that let organized crime flourish almost without interference in the biggest metropolitan areas of the nation. This record convinced the Committee that interstate racketeering should be made a matter of direct federal concern. It was out of these hearings that Title IX of the Organized Crime Control Act of 1970, named the "Racketeer Influenced and Corrupt Organizations Act" was born on October 15 in 1970.

Appellant Sutton and his associates argue that the government failed to plead and prove that the nine appellants in this case had engaged in an enterprise which was "ostensibly legal." Hence, they argue that defendants' enterprise by being totally illegal should escape the augmented penalties for their crimes authorized by this federal statute. In short, it is asserted that this statute, so long and carefully considered by Congress, should be interpreted so as to require the prosecution to prove a negative: that an organized crime operation is *not* totally illegal. If it is totally illegal, under appellants' view, it becomes exempt from the strictures of Title IX of the Organized Crime Control Act of 1970. In addition, on this record it must likewise be argued by appellants that even if the indictment alleges and the proofs show continual use of various ostensibly legal businesses for the purposes of the illegal enterprise and serious adverse impact on others, these facts are insufficient unless the government has proved that the criminal enterprise itself was "ostensibly lawful."

The seven large volumes recording this six week trial show a picture of a centrally directed criminal enterprise involving at least five racketeer-influenced or racketeer-impacted business organizations to commit the offense of trafficking in drugs on a wide scale, supported by ancillary illegal activities of trafficking in stolen jewelry, household goods, and guns. Since we find no reason for such a strained construction in the statutory language itself, nor, as we will detail below in Section IV, in its legal history, we decline the appellants' invitation to emasculate Title IX of the Organized Crime Control Act of 1970.

To conclude this introductory section, we point out that in affirming a prosecution under Title IX of the Organized Crime Control Act of 1970, the Supreme Court of the United States, dealing with arguments very similar to those we have referred to above and will discuss in detail later, quoted from the findings of fact which preceded the Act itself as follows:

The basic purpose of the Organized Crime Control Act of 1970, Pub.L.No. 91–452, 84 Stat. 922, 923, was *"to seek the eradication of organized crime in the United States* by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the *unlawful* activities of those engaged in organized crime."* The content of the Act reflects the dedication with which the Legislature pursued this purpose.

*Iannelli v. United States,* 420 U.S. 770, 786, 95 S.Ct. 1284, 1293, 43 L.Ed.2d 616 (1975) (emphasis added).

### B. The Indictment and Trial

The indictment [1] in this case named five persons as key figures in the operation of a substantial criminal conspiracy. These five were Herschel Weintrub, the manager of Spencer's Jewelry, Middletown, Ohio; Carl Sutton, Jr., alleged to have been with Weintrub "partners in the illegal enterprise described in this indictment"; Edwin Arthur Adams, proprietor of Edwin's Jewelry, Franklin, Ohio; Joseph Elkins, an officer of the John Carter Exterminating Company, Cleveland, Ohio; and, Dyeatra Ann Carter, an officer of the John Carter Exterminating Company, Cleveland, Ohio. Four other appellants, Hensley, Harris, Craven and Rankin, were indicted as important figures in the distribution of narcotics and interstate traffic in stolen goods acquired by the "enterprise." The ninth defendant in this trial, Viola Holmes, was indicted as a "runner" in the drug traffic between Sutton in the Cincinnati area and Carter and Elkins in Cleveland. In number of counts (and convictions on same) the largest aspect of the "enterprise" involved in this case was the buying, possessing and selling of narcotics. Counts 1 and 2 of the indictment al-

leged that appellants and others not involved in this appeal "did unlawfully, wilfully, and knowingly combine, conspire, confederate and agree together and with each other and with ninety-six other persons, none of whom are named as defendants herein, and with diverse other persons whose names are to the Grand Jury unknown, to commit an offense against the United States, that is:

To knowingly conduct and participate directly and indirectly in the conduct of the affairs of an enterprise which was engaged in, and the activities of which affected interstate commerce, said enterprise being an unlawful business enterprise engaged in distribution of controlled substances, interstate transportation of stolen property, receipt of stolen property transported in interstate commerce, and mail fraud, in the Southern District of Ohio and elsewhere."

The indictment further alleged that Sutton and Weintrub obtained heroin "which had previously been imported into the United States from Elkins and Carter in Cleveland and sold same to Adams and other of the appellants for ultimate distribution on the street." The money for the purchases from Elkins and Carter was initially supplied, according to the indictment, by Herschel Weintrub, who is not involved in this appeal, since he has pled guilty and been sentenced.

Each of the appellants was convicted of conducting the affairs of an "enterprise" affecting interstate commerce through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (1976), and of conspiracy to commit that offense, in violation of 18 U.S.C. § 1962(d) (1976). The jury returned guilty verdicts as to the nine appellants on 308 counts. Each of the appellants was also convicted on three or more counts

---

1. The indictment in this case contained 329 counts charging 37 individuals, including the nine appellants, with participating in the Title IX enterprise and conspiracy and in committing two or more racketeering crimes in the categories referred to above. Ten of these defendants were severed from the 37 defendants for purposes of this trial. One of these, Thomas Hill,

was severed from these nine because of possibly prejudicial joinder. The nine appellants involved in this appeal went to trial on 268 of these counts.

Thomas Hill was convicted upon a four-count indictment in a separate jury trial. His appeal was joined for purposes of appellate argument and will be decided in a separate opinion.

alleging substantive drug offenses, primarily possession and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) (1976). In addition, appellant Hensley was convicted on 13 counts of receipt by a convicted felon of firearms shipped in interstate commerce and unlicensed dealing in firearms, in violation of 18 U.S.C. § 922(h) and 18 U.S.C. § 922(a) (1976). In addition, appellant Adams was convicted of transporting or receiving stolen property in interstate commerce, in violation of 18 U.S.C. §§ 2314–15 (1976), and both appellants Adams and Hensley were convicted on numerous counts of mail fraud.

The jury returned not guilty verdicts on 37 counts charged against Sutton, Harris, Carter, Craven, Rankin, Hensley and Holmes. Most of the acquittals were on mail fraud counts and 25 of the acquittals were applicable to appellant Sutton. Sutton was also acquitted on one count of distributing a controlled substance.

Appellant Harris was acquitted on one count of possessing a controlled substance with intent to distribute.

Appellant Hensley was acquitted on three counts of receiving firearms shipped in interstate commerce. The District Judge sentenced the appellants to prison terms ranging from five to 93 years and three years special parole. Seven of the sentences exceed 60 years. The individual sentences are set out in Appendix A to this opinion.

### C. Statutory Construction

If the meaning of a criminal statute adopted by Congress is clear and unambiguous, then there is no need for the courts to turn to interpretation by means of legislative history or rules of statutory construction. Very recently the Supreme Court in a unanimous opinion has reminded us, "It is elementary that '[t]he starting point in every case involving construction of a statute is the language itself.' *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring); *see Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978); *Sante Fe Industries, Inc. v. Green*, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977)." *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979).

Title IX, the section which each of these defendants is charged with violating, provides in applicable part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (1976).

We have previously noted that the dispute in this case concerns the meaning of the term "enterprise." *Enterprise* is a common English word which, as indicated in Webster's Third New International Dictionary Unabridged, means:

> a. a plan or design for a venture or undertaking

> b. venture, undertaking, project; esp: an undertaking that is difficult, complicated, or has a strong element of risk

> c. a unit of economic organization or activity

> d. any systematic purposeful activity or type of activity.

These definitions are all absolutely neutral on the question of whether a particular enterprise is lawful or unlawful.

Congress itself, however, recognized that the meaning of *enterprise* was of critical importance in the statute and hence provided a supplementary statutory definition. 18 U.S.C. § 1961 begins with definitions, and the fourth one reads: " 'enterprise' *includes* any individual, partnership, corporation, association, or other legal entity, and any union or *group of individuals associated in fact although not a legal entity* ; . . . ." (Emphasis added.) It should be noted that in this definition, the word "enterprise" is used without any modifiers, and the same word is employed throughout Title IX with-

out modifiers (except, as we will point out below, the word "any").

Obviously Congress would have known how to characterize an illegal enterprise or a legal enterprise had it seen fit to do so. Its choice of the single word "enterprise" and its actual definition of it seems to us of major importance.

Over and above the fact that Congress used the word "enterprise" without modifiers, its definition clearly includes both legal entities and "any . . . group of individuals associated in fact although not a legal entity."

Further, under the second section of the statute entitled "Prohibited Activities," subsections (b) and (c), Congress employed the word "enterprise," modified by the word "any"; thus, subsection (c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The use of the term "any" before "enterprise" helps make clear that "enterprise" is used in an all encompassing sense. This certainly includes both legal and illegal enterprises. In this regard the Second Circuit in *United States v. Altese*, has said:

> In the light of the continued repetition of the word "any" we cannot say that "a reading of the statute" evinces a Congressional intent to eliminate illegitimate businesses from the orbit of the Act. On the contrary we find ourselves obliged to say that Title IX in its entirety says in

clear, precise and unambiguous language—the use of the word "any" [4]—that all enterprises that are conducted through a pattern of racketeering activity or collection of unlawful debts fall within the interdiction of the Act.

[4] "Any" is defined in Webster's New International Dictionary, Second Edition, as follows: "Indicating a person, thing, etc., as one selected without restriction or limitation of choice, with the implication that everyone is open to selection without exception; all, taken distributively; every; used especially in assertions with emphasis on unlimited scope."

*United States v. Altese*, 542 F.2d 104, 106 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977).

Title IX of the Organized Crime Control Act of 1970 is entitled "Racketeer Influenced and Corrupt Organizations." By these terms Congress included both ostensibly legitimate businesses availed of for criminal purposes (such as Edwin's Jewelry Store,[2] the Spencer's Jewelry Store Co., of Middletown, Ohio,[3] and the Carter Exterminating Company of Cleveland[4] and the wholly corrupt organizations such as the narcotics distribution organizations operated by appellants Rankin, Craven, Hensley and Harris.

It seems clear that an enterprise engaged in or affecting interstate commerce becomes subject to the criminal sanctions of Title IX when, and only when, it is conducted "through a pattern of racketeering activity." In still another and longer section of the definition portion of the statute, Congress defined the specific crimes which are encompassed in the term "racketeering activity." [5]

---

2. Owned by appellant Adams.

3. Managed by Herschel Weintrub, an original coindictee who has now pled guilty.

4. Appellants Dyeatra Ann Carter and Joseph Spinoza Elkins were officers of the Carter Exterminating Co.

5. (1) "racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one

year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire

Appellants were charged, as we have noted above, with an activity and offenses which violated 18 U.S.C. §§ 1962(c) and (d). These two sections provide:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. §§ 1962(c), (d) (1976).

The elements of the crime charged in (c) are: 1) engaging in an enterprise, 2) affecting interstate commerce, 3) conducted through a pattern of racketeering, and 4) involving two or more statutorily-named racketeering crimes.

It requires some imagination to believe that any one of these appellants was in any doubt about the illegality of buying, possessing and selling narcotics; buying, possessing and selling stolen property which had moved in interstate commerce; and buying, possessing and selling stolen guns which had moved in interstate commerce. It is, of course, certainly possible that they were not familiar with the augmented penalties provided by the Organized Crime Control Act of 1970, but its passage has been the subject of far more public notice than the great majority of criminal statutes adopted by the federal government, and the

statute had been fully effective since October 15, 1970.

To summarize this review of the critical statutory language, we point out that an interpretation of the statute which would restrict the use of the term "enterprise" to "ostensibly legitimate" enterprises would commit the following errors of construction. First, it would read out of the statute the statute's own definition of "enterprise" which includes "group of individuals associated in fact although not a legal entity." Second, it would read out of the statute the meaning of the words "any enterprise," as used in the statute. And third, it would read into the statute without any justification therefor the vague phrase "ostensibly legitimate" as a modifier for the word "enterprise" which Congress had seen fit to employ alone.

We do not believe that there is any ambiguity to be found in the use of the word "enterprise" in 18 U.S.C. §§ 1961 and 1962. As a consequence, we see no occasion for employment of the well known canon stated in *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." This is particularly emphasized by the fact that Congress provided specifically that Title IX (the Racketeer Influenced and Corrupt Organizations Act), "Be liberally construed to effectuate its remedial purposes." Pub.L.No. 91–452, Title IX § 904(a), 84 Stat. 947 (1970).

Nor do we believe that there is any conflict, overlapping, or ambiguity created by

fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421–24 (relating to white slave traffic), (C)

any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving bankruptcy fraud, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States; .... 18 U.S.C. § 1961(1) (1976). This section was amended subsequent to the indictments here. *See* 18 U.S.C. § 1961(1) (Supp. III 1979).

the statute's employment of the terms "enterprise" and "pattern of racketeering activity." Congress itself defined both of these terms in simple and understandable language:

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity; . . . .

18 U.S.C. §§ 1961(4), (5) (1976).

"Enterprise" in the context of this case clearly refers to the organization in which these nine defendants (and others) joined to conduct the organization's affairs.

"Pattern of racketeering activity" refers to the various criminal activities (named by statute) engaged in by the "enterprise."

### D. The "Ostensibly Legitimate" Enterprise Issue

The concerns which motivated the majority of the panel in its decision at initial hearing of this case were not frivolous ones. Briefly put, they appear to be these. Some of the deepest concerns of Congress about organized crime came from testimony about major interlocking interstate criminal conspiracies like the Mafia. Many of these criminal activities had serious impact on legitimate businesses. The statute as drafted, however, also strikes at criminal organizations which have much less in the way of financial and manpower resources than those which drew most Congressional attention. These might be subject to appropriate control and suppression through traditional state law enforcement. Therefore, argued the majority of the panel, the statute should be construed under the principle that lenity should be required so that the government must allege and prove that the conspiracy involved in the indictment had

an impact on legitimate business, in accordance with one of Congress' deep concerns. This would be accomplished by judicially modifying the word "enterprise," as used by Congress, to read "ostensibly legitimate enterprise."

The majority of the original panel put the matter this way:

Two of the canons courts traditionally follow in construing criminal statutes also counsel us not to stray from the path marked out by the legislative history. The first of these is that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), unless the legislature has spoken "plainly and unmistakably" to the contrary. *United States v. Gradwell*, 243 U.S. 476, 485, 37 S.Ct. 407, 61 L.Ed. 857 (1917). When as in this case the legislative history speaks "plainly and unmistakably," but in support of resolving the statute's ambiguity in favor of the construction argued by defendants, the maximum applies with special force and tells us that we ought not to strain to accommodate the government's desire for a broader construction.

The other canon that guides us is that, "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971). To be sure, even under appellants' view, RICO still represents a substantial incursion into state criminal jurisdiction. But the government's construction would take us much further into areas traditionally left to state regulation by making a federal felon out of "any individual" or any member of a "group" who has committed any two of the broad range of state offenses denominated "racketeering activity" under section 1961(1). We do not seriously doubt the power of Congress to undertake such a bold expansion of federal criminal jurisdiction. But we will not simply assume

that Congress has done so with this statute, when the text, at best, is ambiguous on the matter and the legislative history suggests a different construction that would not alter the traditional division of responsibilities between federal and state governments quite so radically.

For all of these reasons, we are persuaded to construe section 1962(c) in the manner appellants have suggested. We therefore hold that an "enterprise" within the meaning of the statute is "any individual, partnership, corporation, association . . . and any union or group of individuals associated in fact," that is organized and acting for some ostensibly lawful purpose, either formally declared or informally recognized. Section 1962(c) is violated whenever any person associated with such an enterprise conducts its "affairs," i. e., undertakes any activity on behalf of or relating to the purposes of the enterprise, by committing at least two criminal acts constituting a "pattern of racketeering" as defined in section 1961(5). Since appellants' numerous acts of racketeering were not shown to have been related in any way to the affairs of such an enterprise, we reverse their convictions under section 1962(c) for conducting the affairs of an enterprise through a pattern of racketeering activity and their convictions under section 1962(d) for conspiracy to commit that offense.

*United States v. Sutton,* 605 F.2d 260, 269–70 (6th Cir. 1979).

In Section I.(C.) of this opinion we have pointed out that we find no ambiguity in the statute, and hence find no warrant to do other than accept the statute as Congress wrote it.

█ Alternatively, however, the record in this case fully supports affirmance of these convictions if a requirement of use of or impact on ostensibly legitimate businesses were to be found as a derivative of the legislative history of the Organized Crime Control Act of 1970. The indictment alleged and the proofs in this case show clearly that Edwin's Jewelry Company of Franklin, Ohio, was extensively used by this conspiracy, both as a locale for the transaction of business in narcotics and stolen goods, and as a conduit for the disposition of stolen goods.

In this regard the indictment charged:

8. It was part of said conspiracy that EDWIN ARTHUR ADAMS used his place of business, Edwin's Jewelry, to carry on the business of said enterprise by obtaining heroin and other controlled substances from HERSCHEL HAROLD WEINTRUB and CARL SUTTON, JR., by distributing said heroin and other controlled substances to other distributors, by obtaining and reselling stolen property, and by using the proceeds of sales of stolen property to finance purchases of heroin and other controlled substances from HERSCHEL HAROLD WEINTRUB and CARL SUTTON, JR.

\* \* \* \* \* \*

24. On or about June 14, 1976, EDWIN ARTHUR ADAMS met with a Special Agent of the FBI acting in an undercover capacity and told said Special Agent that he used his place of business, Edwin's Jewelry, to obtain and to resell stolen merchandise.

The evidence repeatedly showed that Adams met this "enterprise's" principals and agents at his ostensibly legal place of business and did a brisk trade in narcotics and various kinds of stolen goods with them. FBI Agent Owens' direct testimony established that Adams sold both narcotics and stolen goods to him. Adams' deals were generally made in the jewelry store. Acting entirely independent of Owens, Cincinnati Police Officer Arkenau met Adams at Edwin's Jewelry while posing as someone who supplied narcotics and stolen goods to students at the University of Kentucky in Lexington. On that day he bought heroin from Adams and was offered a stolen stove and two stolen firearms, both of which he later bought.

The indictment also charged and the proofs at trial showed that a substantial quantity of watches and jewelry stolen in a burglary of the Miller's Jewelry Store in

South Dakota ended up for sale in Edwin's Jewelry in Franklin, Ohio.

The emphasis we place upon the role of Edwin's Jewelry and its proprietor Edwin Adams is further demonstrated by the evidence concerning its central position in the enterprise charged and proved in this organized crime prosecution. Cincinnati Policeman Arkenau testified:

Q. Now, after you had made your purchase, Sergeant Arkenau, did you talk to Edwin about any other matters other than the heroin that he sold you?

A. Yes, we did. We continued our discussion on stolen property of what I would be able to sell down at the University. I mentioned that stereo equipment, typewriters and adding machines were items that students would be able to use in the dorms if they were cheap, and they were items they could purchase and I could turn them over if he could obtain them.

He produced, or Edwin produced a list of stereo equipment on a sheet of paper. There were several sheets of paper stapled together or rolled up together, and I reviewed it and said that these were the type of items I could probably get rid of down at the University. There were about eight complete sets of stereo equipment on this list.

Mr. Adams produced a list of 45 guns. This was on a sheet of paper, and it had a list of different types of guns on it, and at the bottom there was a number 45, and next to it was the number $5,000—I don't think that was the whole number, but it was five thousand and some odd dollars.

At this time, Edwin related the guns were worth approximately $300 apiece and that Otis had sold them all for $20 apiece, and that he had messed up the sale, and they were trying to get that straightened out.

Q. What, if any, discussions did you have with Mr. Adams concerning the organization or its operation in any aspect?

A. After we discussed the stolen property goods, I started to talk about the heroin operation. Edwin related to me the entire setup of how the operation was started out and how it was founded. Edwin related that the main individual who started the organization was an individual they called J.P., the initials of J.P., and he was the head of the organization several years ago.

He also then started to tell me that the organization was split up among three of J.P.'s trusted friends, and one of these three individuals Edwin Adams and Herschel Weintrub had met, and this individual they mentioned by the first name of Carl, and Carl did not have the money to back the operation, so they went to Herschel and Edwin to finance the operation, and Carl would furnish the drugs.

During this time, Edwin said they buy their heroin a kilo at a time for approximately $20,000 a kilo, and it would be in the vicinity of 20 percent pure by the time they got it.

We discussed the heroin, and Edwin said when he first started the operation, they would take the 20 percent pure heroin, package it up and immediately put it out on the street. They received some complaints from a man in Dayton who apparently shot the heroin, and it was too strong for him. He started to overdose, or he did overdose, and they started then to cut it down.

Well, then they got a complaint from the Cincinnati area that the heroin they were supplying to Cincinnati was too weak. With this, Edwin packaged up what he called a T of heroin and took it to Cincinnati and met with this man, one of their main suppliers in Cincinnati, he met with him and brought the heroin with him. This supplier called the heroin addict to his house, and at this time this addict shot up some heroin, and Edwin mentioned his head immediately hit the table.

The dealer in Cincinnati apologized to Edwin for calling him down. Apparently, the heroin addict or junkie was recutting the heroin to try to make himself some money.

Edwin then stated that it would cost him $7,000 and Herschel $7,000. They would pool their money together and then Carl would furnish the other money, and they would go together and Carl would pick up the heroin to be distributed.

The conversation of Edwin related this story, and we went on to the purchase of the firearms afterwards.

Q. In relationship with that, did you buy anything else from Mr. Adams on that date?

A. Yes, I did. After talking about the heroin operation, Mr. Adams had on the table a .45-caliber Star automatic weapon that I previously looked at and wanted to buy and agreed to pick up this date.

He slid the gun over to me. I examined it. Inside the package was a slip of paper with the name of Pedro Pete Muscari written on it with the address of Pete Muscari and an address of Breezeway Motor Court, Middletown, Ohio. This was inside the plastic box.

Also inside the box was the weapon and the magazine.

Q. Now, you had stated that you purchased this gun. Did you pay an additional amount for this gun or did it come with your other purchase that day?

A. No, I had to pay another hundred dollars for the gun.

Edwin made a phone call. First the gun was offered to me for $150, and I wouldn't pay $150 for the gun. Edwin made a phone call, and stated that Dan was here. Well, when he called, he asked, "Is he there?" Then, Edwin stated that Danny was up here and wanted to buy the gun and would they sell it for a hundred dollars.

Apparently, the man agreed to sell it to me for a hundred dollars. Edwin nodded. I then gave Edwin—at first I gave him $800 trying to save myself some money, and Edwin counted it out and told me I owed him another $50, so I paid him a total of $850, $750 for the heroin and another hundred for the gun.

Q. Would the clerk please hand the witness Government's Exhibit 18?

(Government's Exhibit 18 handed to the witness.)

Sergeant Arkenau, have you examined Government's Exhibit 18?

A. Yes, I have.

Q. And what is it?

A. That is a Star .45-caliber automatic weapon with a magazine in a plastic box containing the weapon and a slip of paper with the name of Pete Muscari, Breezeway Motor Court, Middletown, Ohio. All of these have my badge number, 262, and the date of August 4, 1976, inscribed on them.

Q. Would you hold that gun up a little bit so we can see it?

(Gun held up.)

Did you discuss any potential future purchases of heroin with Mr. Adams?

A. Yes, we did. After I purchased the gun, we continued to talk. Edwin was telling me about how easy it was to be a fence or a dealer of stolen merchandise. Since he was in the jewelry-type business, he could purchase items and melt them down and remake them since he had a certain type of manufacturer's license.

I told him I didn't know a whole lot about the jewelry business, whether it was a good diamond or bad diamond, and so forth, and he explained that it was real easy to be a jewelry fence in the legitimate business of a jewelry store.

On May 11 Agent Owens (in his undercover role) was told by Adams that his heroin suppliers were "Carl" and "Herschel." Carl Sutton and Herschel Weintrub and appellant Otis Hensley were repeatedly identified and photographed at Edwin's Jewelry.

Hensley, whose stolen goods were frequently sold by Adams through use of Edwin's Jewelry, told Agent Arkenau that he had 12 burglary rings working for him:

Q. After the discussion you just outlined, what, if anything, happened next?

A. After we left the restaurant, we went back to Edwin Adams' store in Franklin, Ohio. We started talking about my being able to pick up adding machines and typewriters, and so forth, to sell down at the University, and Otis informed me that he could get me 20 adding machines and 20 typewriters immediately because he had the key to an office supply store.

Q. Sergeant Arkenau, when you say Otis, to whom are you referring?

A. Otis Hensley.

Q. After your discussion about the adding machines and typewriters, do you recall any further discussions you had?

A. Edwin and Otis advised me they had these twelve teams of burglars working for them, and anything I needed they could get. All I had to do was really place an order, and they would pick it up for me.

Edwin then produced a sheet of paper from a black notebook which had several lists of stereo components on it. I examined it and looked at it and wanted to know how much they were, and Edwin then handed it to Otis, and Otis looked at it and agreed they would have to look at this merchandise to be able to give me the exact price.

I then requested if I could keep this or that they make a copy of it for me. Edwin started to make a copy of the sheet of paper he handed to me.

Q. Would the clerk please hand the witness Government's Exhibit 22?

(Government's Exhibit 22 handed to the witness.)

Sergeant Arkenau, you have now been handed Government's Exhibit 22, and I will ask you what that is.

A. This is the exhibit that Edwin Adams copied for me on 8–24–76 in his store, and it is marked with my badge number.

Q. After this discussion, what, if anything, did you do?

A. Edwin started to write the note. I inquired if I could look at the items that Otis had offered for sale.

Both myself and Otis Hensley departed the store and went out to his automobile where he opened the trunk of the car up. I looked at the material inside and offered him $250 for everything that was in the trunk. These were the adding machines, the television and cameras, and so forth, in the trunk.

Otis shut the trunk and said he had more than that invested in it. So, we left the car and went back to the store. We went in the store and Edwin was still seated at the desk copying this receipt.

Q. The receipt that you identified?

A. That's correct. Once inside the store, I noticed that the phone kept constantly ringing, and after once Edwin got off the phone, I asked him if any more heroin was due in shortly because I would probably be needing some more, but I wanted to get a better price on it.

I presented the situation that my mother was gravely ill in Florida, and I had to help my dad with the finances of paying for the doctor bills, and I wanted a better cut on the price of heroin.

Edwin explained to me that the people in Cincinnati are complaining they want more money for it, and now I want to buy it for less money, and he would have to see what he could do for me.

Otis then offered the items in the car for $350 if I would take everything as it was.

I agreed to the $350 price. Myself and Otis left the store, went out and loaded the items from his car into my car. I handed Otis $360 and went back in the store where Otis handed the money to Edwin. Edwin handed Otis back $10 who in turn gave me the $10 change.

At a point later in the trial, a photostatic copy of the list of items referred to in the foregoing testimony was introduced. That list contained 12 items of stereo equipment.

After this six-week trial, the jury found the following concerning Edwin's Jewelry of Franklin, Ohio:

We, the Jury herein, unanimously find that the defendant EDWIN ARTHUR

ADAMS has been found guilty of Count 1 or Count 2 of the indictment; that he acquired or maintained an interest in Edwin's Jewelry, 426 South Main Street, Franklin, Ohio, between May 6, 1976, and July 6, 1977, and that he carried on the business of an illegal enterprise through such business between the foregoing dates.

Special Verdict Form A, Docket Edwin's Jewelry, CR 1 77–73, Document No. 31.

The District Judge subsequently impounded the assets of Edwin's Jewelry in the following order:

> Pursuant to the Jury's verdict of forfeiture of Edwin's Jewelry Store, and based upon the Affidavit of Special Agent Grant E. Beise of the F.B.I. that Edwin Arthur Adams moved the assets of Edwin's Jewelry Store to Lanecrest Jewelry, 48 Millard Drive, Franklin, Ohio,
>
> IT IS HEREBY ORDERED that the F.B.I. padlock the premises of Lanecrest Jewelry, 48 Millard Drive, Franklin, Ohio, until such time as an inventory of the assets of said premises can be made and furnished to the Court.

Order of Nov. 1, 1977, Docket No. CR 1 77–73–5, Document No. 30.

Another "ostensibly legitimate" business was also deeply involved in this criminal conspiracy. It was Spencer's Jewelry of Middletown, Ohio, of which Herschel Weintrub was the proprietor. As we have previously noted, Weintrub was not a part of this trial, since he pled guilty, but this record is replete with evidence about his role. The record warrants the conclusion that he and Carl Sutton were leading figures in this criminal conspiracy, that Sutton (aided by Viola Holmes) was the contact with the Cleveland suppliers Elkins and Carter, that Weintrub supplied financing for drug purchases to Sutton, and that Sutton and Adams (and sometimes Weintrub) in turn sold smaller quantities to appellants Hensley, Harris, Craven and Rankin, each of whom headed a street distribution operation. Appellant Hensley's specialty was stolen goods, much of which he distributed through Adams and Edwin's Jewelry.

Weintrub managed Spencer's Jewelry and transacted the business of this illegal conspiracy at the store. This is shown in this record both by direct evidence of law enforcement agents who penetrated this ring undercover and by massive evidence furnished by search warrant-authorized wiretap transcripts to have been continually involved in the purchasing of illegal drugs (through Sutton) and the sale of said drugs to Adams and other defendants. He was also involved with Adams in the acquisition and sale of stolen goods.

He is also shown to have initiated a scheme with Hensley whereby Hensley and he defrauded a legitimate business, Nationwide Insurance Co., of $7,500. Weintrub's interest lay in the fact that Hensley was in debt to him (Weintrub) for heroin to the tune of $525. Weintrub supplied Hensley with fraudulent jewelry sales slips from Spencer's Jewelry to help him prove his "losses" in his fraudulent claims against his lawful insurer, Nationwide Insurance Co.

The proofs in this trial allowed the jury to find that this was a large-scale criminal enterprise operated by these nine appellants (plus guilty pleader Weintrub) and many other relatively minor figures (23 of whom have now pled guilty). Those proofs also warrant this court in concluding that the enterprise involved and affected interstate (and international commerce in its heroin aspect), that it employed at least two[6] os-

---

6. A third ostensibly legitimate business involvement concerns the Carter Exterminating Co. of Cleveland. Appellants Carter and Elkins were both officers of this concern and were convicted as the major suppliers of illegal drugs for this whole operation. Additionally, evidence seized in a search warrant-authorized search of the home of Viola Holmes (the convicted "runner") showed that she had charged her motel bill to the Carter Exterminating Co. Furthermore, in phone conversations between Carl Sutton and Dyeatra Carter, transcribed in the record, it may be seen that terms such as "roach spray" likely to be employed in the exterminating business, were actually used as a code for transacting heroin business in an obvious effort to confuse any would-be listeners. An expert interpretation of such phone conversations appears in the record at pages 3949 to 3952.

tensibly legitimate businesses (*i. e.* Edwin's Jewelry of Franklin, and Spencer's Jewelry of Middletown) as both fronts and bases of operation, and that it had adverse economic impact upon two other legitimate business enterprises, Miller's Jewelry of Huron, South Dakota, and upon Nationwide Insurance Co.

This particular "enterprise" prosecuted under the Racketeer Influenced and Corrupt Organizations Act is certainly not shown to be nationwide in scope or capable of dominating the area in which it was operating, as some evidence presented to Congress showed was true concerning other major organized crime operations. It had, however, achieved a massive street distribution of heroin affecting many young people in at least two states, and it had shown capability for stimulation of interstate traffic in stolen household goods, jewelry and guns. On these facts we cannot hold that this "enterprise" was beyond the contemplation of Congress when it passed Title IX of the Organized Crime Control Act of 1970.

The point of Section I.(D.) of this opinion is not to suggest that the "enterprise" charged and proved in this case was other than that set forth in the indictment. Appellants were charged with conspiring:

> To knowingly conduct and participate directly and indirectly in the conduct of the affairs of an enterprise which was engaged in, and the activities of which affected interstate commerce, said enterprise being an unlawful business enterprise engaged in distribution of controlled substances, interstate transportation of stolen property, receipt of stolen property transported in interstate commerce, and mail fraud, in the Southern District of Ohio and elsewhere.

The enterprise thus charged and proved to the satisfaction of the jury and this court was a thoroughly illegal organization.

In this section we have, however, pointed out how this case illustrates the appropriateness of Congressional concern about organized crime's infiltration of or impact on legitimate (or "ostensibly legitimate") business as that concern is exemplified in the legislative history of the Organized Crime Control Act of 1970. Assuming that a purpose of protecting legitimate business from the depredations of organized crime may be found in Title IX, this prosecution serves effectively to vindicate that purpose. This record clearly shows that Miller's Jewelry of Huron, South Dakota, and Nationwide Insurance Co. of Columbus, Ohio, were, as charged in the indictment, victims of this "unlawful business enterprise." In addition, Edwin's Jewelry of Franklin, Ohio, and Spencer's Jewelry of Middletown, Ohio, were clearly shown (as charged in the indictment) to have been infiltrated and used as a front for the illegal purposes of this unlawful enterprise. Yet a fifth "ostensibly legitimate" business, Carter Exterminating Co. of Cleveland, Ohio, is shown to be involved with this unlawful enterprise, but to a less well-defined degree.

The basic interpretation of Title IX of the Organized Crime Control Act of 1970 and its employment of the word "enterprise" which this opinion sets forth has now been endorsed by a large majority of the United States Courts of Appeals which have thus far considered the issue. *E. g., United States v. Whitehead*, 618 F.2d 523 (4th Cir. 1980); *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Rone*, 598 F.2d 564 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Swiderski*, 593 F.2d 1246 (D.C. Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979); *United States v. Elliot*, 571 F.2d 880 (5th Cir.), *cert. denied sub nom. Delph v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Altese,* 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977). *Contra, United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980); *United States v. Turkette*, 632 F.2d 896 (1st Cir. 1980, as amended Sept. 25, 1980).

While this case has been pending before the en banc court, panels in two circuits have released opinions (cited immediately

above) following the general approach which was adopted by Judge Merritt's majority panel opinion in this court.

We believe what has been said above concerning the legal aspects of this case affords sufficient answer to these two opinions. They, like the dissent herein, represent a doubtless conscientious view on the part of the judges concerned that Congressional adoption of Title IX of the Organized Crime Control Act of 1970 was inadvisable. Yet none of the opinions deny that the government's prosecution of an illegal enterprise is squarely authorized by the statute,[7] and none of the opinions deny that the Congress had constitutional authority to adopt it. We reiterate that the Congress of the United States considered the threat to "domestic tranquility" posed by organized crime for two decades before adopting what the Supreme Court has described as follows: "The Act is a carefully crafted piece of legislation." *Iannelli v. United States,* 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975).

The Congressional Statement of Findings and Purpose of the Organized Crime Control Act of 1970 strongly supports the conclusions reached by the majority of these courts and by this opinion:

Section 1 of Pub.L. 91–452 provided in part that:

"The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

"*It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.*"

18 U.S.C. § 1961 *et seq.* (1976) (emphasis added).

## II. THE INDICTMENT AND THE "ENTERPRISE" PROOFS

The preceding sections of this opinion were written following an en banc hearing at which the sole issue argued by attorneys for the appellants was their insistence that the panel opinion which had been set aside by en banc vote should be adopted by the en banc court for the reason that Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. § 1961 *et seq.* (1976), should be interpreted as requiring charge and proof of an "ostensibly legitimate enterprise." Judge Merritt, who wrote the majority panel opinion which had taken that position in

---

**7.** (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. . . .
18 U.S.C. § 1961(4) (1976).

reversing the District Court verdicts in this case, has now in his dissent relegated the statutory interpretation issue to last rather than first place.

The main emphasis of the dissent appears to us to be the following: "There is no proof whatever that six of the defendants—Elkins, Carter, Sutton, Holmes, Rankin, and Craven—had knowledge of the stolen merchandise, burglary, fencing and mail fraud activities. There is not a word or a line in the record from which it could be inferred that these six defendants agreed, intended to conduct, or participated in an enterprise engaged in burglary, fencing and mail fraud." These two sentences illustrate a misunderstanding of the applicable law as well as a lack of adequate acquaintance with this record.

■ The Supreme Court has never held that it is a requirement of a valid conviction for conspiracy, that every conspirator must have "agreed, intended to conduct or participated" in every crime committed by other co-conspirators in the event the crime was within the scope of the conspiracy which he was proved to have joined. Squarely in point concerning the criminal enterprise in this case is the statement in *United States v. Elliott*, 571 F.2d 880, 902–03 (5th Cir.), *cert. denied sub nom. Delph v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) (footnote omitted):

> [T]he object of a RICO conspiracy is to violate a substantive RICO provision—here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity—and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity. The gravamen of the conspiracy charge in this case is not that each defendant agreed to commit arson, to steal goods from interstate commerce, to obstruct justice, and to sell narcotics; rather, it is that each agreed to participate, directly and indirectly, in the affairs of the enterprise by committing two or more predicate crimes. Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs. To find a single conspiracy, we still must look for agreement on an overall objective. What Congress did was to define that objective through the substantive provisions of the Act.

■ The proofs in this case were such as to allow the jury to find beyond reasonable doubt that each of these defendants violated the critical section of Title IX which declares:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (1976). This 6,250 page record demonstrates that the jury could have found on competent evidence that all of the nine defendants were engaged in, employed by, or associated with the criminal enterprise described in this indictment, and that they conducted or participated directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity.

There is no question that central to this enterprise's operation was a conspiracy to sell heroin. Every one of the nine persons concerned was engaged in important activities in the conduct of this illegal business. We emphasize that we do not deal here with allegations of the possession of narcotics for use by any defendant. These nine were not addicts. They were engaged in a wholesale heroin operation throughout southern Ohio and northern Kentucky. Each of the nine defendants was not only convicted on the charge of conducting the illegal Title IX enterprise and conspiracy to do so, but were individually convicted on three or more substantive felony counts of drug sale related offenses.

As is true in any enterprise, some of the conspirators were at the very center of the enterprise. They were Herschel Weintrub, Carl Sutton, and Edwin A. Adams. Weintrub and Adams operated the heroin conspiracy from their respective jewelry stores (previously described above) in close and continual partnership with Carl Sutton. Adams and Weintrub also used their jewelry stores for fencing stolen jewelry, stolen firearms, stolen household goods, and the commission of mail fraud. The evidence shows and the jury could have found that they used the proceeds of these ancillary crimes to finance further purchases of heroin. This was in fact an integrated "enterprise."

As noted earlier, Weintrub, originally a defendant in this case, pleaded guilty before trial and has been sentenced. The record shows conclusively that he was the financier for the enterprise and probably its brains. Carl Sutton was the most important contact with Carter and Elkins, who from Cleveland supplied the drugs for this ring. But the evidence in this record is such as to allow the jury to find that he also participated in the fencing activities of Adams and Weintrub.

The dissent mistakes the fundamental thrust of the law of conspiracy and criminal enterprise. It even more badly mistakes what this record discloses about this conspiracy and this criminal "enterprise."

Scholarly debate has not ceased concerning whether or not Congress *should* make conspiracy to commit unlawful acts a crime separate from the substantive offense. The law pertaining to this issue has, however, been settled at least since 1945, when the Supreme Court decided *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In that case, with only one partial dissent, the late Justice William O. Douglas spelled out in detail the law pertaining to the proofs necessary to establish a criminal conspiracy and the relationship between conspiracy and substantive crimes. What follows is, we believe, equally applicable to the illegal "enterprise" charged and proved in this case:

It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. The power of Congress to separate the two and to affix to each a different penalty is well established. *Clune v. United States*, 159 U.S. 590, 594–595 [16 S.Ct. 125, 126, 40 L.Ed. 269]. A conviction for the conspiracy may be had though the substantive offense was completed. See *Heike v. United States*, 227 U.S. 131, 144 [33 S.Ct. 226, 228, 57 L.Ed. 450]. And the plea of double jeopardy is no defense to a conviction for both offenses. *Carter v. McClaughry*, 183 U.S. 365, 395 [22 S.Ct. 181, 193, 46 L.Ed. 236]. It is only an identity of offenses which is fatal. See *Gavieres v. United States*, 220 U.S. 338, 342 [31 S.Ct. 421, 422, 55 L.Ed. 489]. Cf. *Freeman v. United States*, 146 F.2d 978 (6th Cir.). A conspiracy is a partnership in crime. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253 [60 S.Ct. 811, 858, 84 L.Ed. 1129]. It has ingredients, as well as implications, distinct from the completion of the unlawful project. As stated in *United States v. Rabinowich*, 238 U.S. 78, 88 [, 35 S.Ct. 682, 684, 59 L.Ed. 1211]:

"For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered."

And see *Sneed v. United States*, 298 F. 911, 912–913 (5th Cir.); *Banghart v. United States*, 148 F.2d 521 (4th Cir.).

Moreover, it is not material that overt acts charged in the conspiracy counts were also charged and proved as substantive offenses. As stated in *Sneed v. United States, supra,* 298 F. p. 913, "If the overt act be the offense which was the object of the conspiracy, and is also punished, there is not a double punishment of it." The agreement to do an unlawful act is even then distinct from the doing of the act.[4]

[4] The addition of a conspiracy count may at times be abusive and unjust. The Conference of Senior Circuit Judges reported in 1925:

"We note the prevalent use of conspiracy indictments for converting a joint misdemeanor into a felony; and we express our conviction that both for this purpose and for the purpose—or at least with the effect—of bringing in much improper evidence, the conspiracy statute is being much abused.

"Although in a particular case there may be no pre-concert of plan, excepting that necessarily inherent in mere joint action, it is difficult to exclude that situation from the established definitions of conspiracy; yet the theory which permits us to call the aborted plan a greater offense than the completed crime supposes a serious and substantially continued group scheme for cooperative law breaking. We observe so many conspiracy prosecutions which do not have this substantial base that we fear the creation of a general impression, very harmful to law enforcement, that this method of prosecution is used arbitrarily and harshly. Further the rules of evidence in conspiracy cases make them most difficult to try without prejudice to an innocent defendant." Annual Report of the Attorney General for 1925, pp. 5–6.

But we do not find that practice reflected in this present case.

It is contended that there was insufficient evidence to implicate Daniel in the conspiracy. But we think there was enough evidence for submission of the issue to the jury.

There is, however, no evidence to show that Daniel participated directly in the commission of the substantive offenses on which his conviction has been sustained,[5] although there was evidence to show that these substantive offenses were in fact committed by Walter in furtherance of the unlawful agreement or conspiracy ex-

isting between the brothers. The question was submitted to the jury on the theory that each petitioner could be found guilty of the substantive offenses, if it was found at the time those offenses were committed petitioners were parties to an unlawful conspiracy and the substantive offenses charged were in fact committed in furtherance of it.[6]

[5] This question does not arise as to Walter. He was the direct actor in some of the substantive offenses on which his conviction rests. So the general sentence and fine are supportable under any one of those. See note 1, *supra.*

[6] The trial court charged: "... after you gentlemen have considered all the evidence in this case, if you are satisfied from the evidence beyond a reasonable doubt that at the time these particular substantive offenses were committed, that is, the offenses charged in the first ten counts of this indictment if you are satisfied from the evidence beyond a reasonable doubt that the two defendants were in an unlawful conspiracy, as I have heretofore defined unlawful conspiracy to you, then you would have a right, if you found that to be true to your satisfaction beyond a reasonable doubt, to convict each of these defendants on all these substantive counts, provided the acts referred to in the substantive counts were acts in furtherance of the unlawful conspiracy or object of the unlawful conspiracy, which you have found from the evidence existed." Daniel was not indicted as an aider or abettor (see Criminal Code, § 332, 18 U.S.C. 550), nor was his case submitted to the jury on that theory.

Daniel relies on *United States v. Sall, supra* [116 F.2d 745 (3rd Cir. 1940)]. That case held that participation in the conspiracy was not itself enough to sustain a conviction for the substantive offense even though it was committed in furtherance of the conspiracy. The court held that, in addition to evidence that the offense was in fact committed in furtherance of the conspiracy, evidence of direct participation in the commission of the substantive offense or other evidence from which participation might fairly be inferred was necessary.

We take a different view. We have here a continuous conspiracy. There is here no evidence of the affirmative action on the part of Daniel which is necessary

to establish his withdrawal from it. *Hyde v. United States*, 225 U.S. 347, 369 [32 S.Ct. 793, 803, 56 L.Ed. 1114]. As stated in that case, "Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law. As the offense has not been terminated or accomplished he is still offending. And we think, consciously offending, offending as certainly, as we have said, as at the first moment of his confederation, and consciously through every moment of its existence." *Id.*, p. 369 [32 S.Ct. at 803]. And so long as the partnership in crime continues, the partners act for each other in carrying it forward. It is settled that "an overt act of one partner may be the act of all without any new agreement specifically directed to that act." *United States v. Kissel*, 218 U.S. 601, 608 [31 S.Ct. 124, 126, 54 L.Ed. 1168]. Motive or intent may be proved by the acts or declarations of some of the conspirators in furtherance of the common objective. *Wiborg v. United States*, 163 U.S. 632, 657–658 [16 S.Ct. 1127, 1137, 41 L.Ed. 289].

*Pinkerton v. United States, supra* at 643–47, 66 S.Ct. at 1182–1184.

Much more recently, the Supreme Court has cited the *Pinkerton* case with approval in *United States v. Iannelli, supra.* There Justice Powell said for the Court:

Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes. Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act. *See, e. g., United States v. Feola, ante,* p. 671; *Pinkerton v. United States,* 328 U.S. 640, 644 [66 S.Ct. 1180, 1182, 90 L.Ed. 1489] (1946); *Braverman v. United States,* 317 U.S. 49, 53, [63 S.Ct. 99, 101, 87 L.Ed. 23] (1942). Unlike some crimes that arise in a single transaction, see *Heflin v. United States,* 358 U.S. 415 [79 S.Ct. 451, 3 L.Ed.2d 407] (1959); *Prince v. United States,* 352 U.S. 322 [77 S.Ct. 403, 1 L.Ed.2d 370] (1957), the conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act. *Pinkerton v. United States, supra,* at 643, [66 S.Ct. at 1181]. Thus, it is well recognized that in most cases separate sentences can be imposed for the conspiracy to do an act and for the subsequent accomplishment of that end. *Feola, supra; Callanan v. United States,* 364 U.S. 587 [81 S.Ct. 321, 5 L.Ed.2d 312] (1961); *Pinkerton, supra; Carter v. McClaughry,* 183 U.S. 365 [22 S.Ct. 181, 46 L.Ed. 236] (1902). Indeed, the Court has even held that the conspiracy can be punished more harshly than the accomplishment of its purpose. *Clune v. United States,* 159 U.S. 590 [16 S.Ct. 125, 40 L.Ed. 269] (1895).

The consistent rationale of this long line of decisions rests on the very nature of the crime of conspiracy. This Court repeatedly has recognized that a conspiracy poses distinct dangers quite apart from those of the substantive offense.

"This settled principle derives from the reason of things in dealing with socially reprehensible conduct: collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group

limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise." *Callanan v. United States, supra,* at 593–594, 81 S.Ct. at 325.

*Iannelli v. United States, supra* at 777–78, 95 S.Ct. at 1289 (footnotes omitted).

As we read it, the most important legal argument advanced by the dissent is stated in these words:

In *Kotteakos v. United States,* 328 U.S. 750, [66 S.Ct. 1239, 90 L.Ed. 1557] (1946), the Supreme Court had made the same basic point. It reversed convictions because the evidence showed multiple conspiracies rather than the one alleged in the indictment.

In the *Kotteakos* case, Justice Rutledge phrased the question as follows:

The only question is whether petitioners have suffered substantial prejudice from being convicted of a single general conspiracy by evidence which the Government admits proved not one conspiracy but some eight or more different ones of the same sort executed through a common key figure, Simon Brown.

*Kotteakos v. United States,* 328 U.S. 750, 752, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The opinion then described the nature of the evidence in the case:

Simon Brown, who pleaded guilty, was the common and key figure in all of the transactions proven. He was president of the Brownie Lumber Company. Having had experience in obtaining loans under the National Housing Act, he undertook to act as broker in placing for other loans for modernization and renovation, charg-

ing a five per cent commission for his services. Brown knew, when he obtained the loans, that the proceeds were not to be used for the purposes stated in the applications.

*Id.* at 753, 66 S.Ct. at 1242. The opinion then recited evidence of a lawyer who fraudulently procured a loan to finance opening his law office by stating the purpose of the loan was that of modernizing his father's house. No facts relating the lawyer to any of the other "conspirators" except Brown were recited. The facts in *Kotteakos* were further stated as follows:

The evidence against the other defendants whose cases were submitted to the jury was similar in character. They too had transacted business with Brown relating to National Housing Act loans. *But no connection was shown between them and petitioners, other than that Brown had been the instrument in each instance for obtaining the loans.* In many cases the other defendants did not have any relationship with one another, other than Brown's connection with each transaction. *As the Circuit Court of Appeals said, there were "at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with Brown as their agent."* 151 F.2d at 172. As the Government puts it, the pattern was "that of separate spokes meeting in a common center," though, we may add, without the rim of the wheel to enclose the spokes.

*Id.* at 754–55, 66 S.Ct. at 1242 (footnote omitted; emphasis added).

We both accept and agree with the principles of the *Kotteakos* case. For one man to agree to and execute housing fraud upon the United States government as the agent of eight separate and unrelated individuals in eight separate transactions does not constitute a single conspiracy involving all—

nor would it, without more facts, constitute participation in a Title IX "enterprise." As the Supreme Court said:

> We do not think that either Congress, when it enacted § 269, or this Court, when deciding the *Berger* case, intended to authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all.

*Id.* at 773, 66 S.Ct. at 1252.

The differences between *Kotteakos* and our present case are very great.

First, as we have pointed out above, the primary conspiracy was one to engage in the sale of narcotics, principally heroin. All nine of the defendants were proven to have engaged in felonies related to the possession of heroin for distribution, or the sale of heroin, or the use of the telephone to facilitate sale of heroin, or to sell it. In fact, all nine of these appellants were convicted on competent evidence on three or more substantive offenses of the variety just described.

Second, we call attention again to the testimony of Agent Owens and Sergeant Arkenau set forth on pages 17–23 of this opinion. Among other things, as will be recalled, Arkenau stated:

> Edwin related to me the entire setup of how the operation was started out and how it was founded. Edwin related that the main individual who started the organization was an individual they called J. P., the initials of J. P., and he was the head of the organization several years ago.

> He also then started to tell me that the organization was split up among three of J.P.'s trusted friends, and one of these three individuals Edwin Adams and Herschel Weintrub had met, and this individual they mention by the first name of Carl, and Carl did not have the money to back the operation, so they went to Herschel and Edwin to finance the operation, and Carl would furnish the drugs.

> During this time, Edwin said they buy their heroin a kilo at a time for approximately $20,000 a kilo, and it would be in the vicinity of 20 percent pure by the time they got it.

After describing how he paid Edwin Adams $850, "750 for the heroin and another hundred for the gun," Arkenau subsequently continued:

> After I purchased the gun, we continued to talk. Edwin was telling me about how easy it was to be a fence or a dealer of stolen merchandise. Since he was in the jewelry-type business, he could purchase items and melt them down and remake them since he had a certain type of manufacturer's license.

> I told him I didn't know a whole lot about the jewelry business, whether it was a good diamond or bad diamond, and so forth, and he explained that it was real easy to be a jewelry fence in the legitimate business of a jewelry store.

On May 11 Agent Owens (in his undercover role) was told by Adams that his heroin suppliers were "Carl" and "Herschel." Carl Sutton and Herschel Weintrub and appellant Otis Hensley were repeatedly identified and photographed at Edwin's Jewelry.

Hensley, whose stolen goods were frequently sold by Adams through use of Edwin's Jewelry, told Agent Arkenau that he had 12 burglary rings working for him.

Third. The continual association of Weintrub, Adams and Sutton as the executive group of this enterprise is portrayed in dozens of pages of this lengthy transcript,

but perhaps most vividly in the pictures of meetings between these three on the night of May 6, 1976, and (with Hensley) on May 17:

EXHIBIT 1

*H. Weintrub* & *Carl Sutton* in front of Edwin's Jewelry Store. Taken May 6, 1976, 8:50 p.m. by C. Barry Pickett.

EXHIBIT 2

*Adams, Sutton and H. Weintrub* leaving Edwin's Jewelry Store.   Taken May 6, 1976, 10:15 p.m. — Pickett testimony.

Even more explicit of the relationship between Weintrub, Adams and Sutton are pictures taken of the three of them both arriving and leaving on the night of May 17, 1976.

It will be noted from the pictures below that Weintrub entered Adams' store with two small "gold-colored boxes" and subsequently Sutton departed carrying those same boxes:

EXHIBIT 8

*Carl Sutton* entering Edwin's Jewelry Store (empty handed). Taken May 17, 6:18 p.m. — Pickett testimony.

EXHIBIT 5

*H. Weintrub* walking to Edwin's Jewelry Store. Taken May 17, 6:37 p.m. — Pickett testimony.

EXHIBIT 6

*H. Weintrub* entering Edwin's Jewelry with gold-colored boxes under his arm — being let in by *Otis Hensley.* Taken May 17, 1976, approx. 6:37 p.m. — Pickett testimony.

Concerning this sequence of pictures, Agent Pickett testified:

Q. After Mr. Hensley checked the door, what, if anything, did you observe subsequent to that time?

A. After that, I observed Herschel Weintrub arrive at Edwin's Jewelry Store, and he was carrying two gold-colored small boxes under his arm.

EXHIBIT 7

*Carl Sutton* departing Edwin's Jewelry Store carrying the two gold-colored boxes Weintrub carried on entering the store. Taken May 17, 1976, 7:28 p.m.

Agent Pickett testified concerning this exhibit:

Q. Can you identify Government's Exhibit 7, please?

A. Yes, sir. That is a picture of Mr. Sutton as he is leaving Edwin's Jewelry Store with the two gold-colored boxes in his left hand.

Fourth. The principal conspirators treated all of their illegal activities as part of one illegal enterprise.

Adams offered to and did sell both heroin and stolen goods to both Agent Owens and Sergeant Arkenau while both were acting undercover. The judge and the jury had a right to infer from their evidence that this was a regular pattern which commingled both the stolen goods and heroin proceeds and employed both in financing the principal business of heroin purchase and sale.

This pattern was repeatedly confirmed in the conversations between the principal conspirators and their sales agents such as Hensley and Harris.

During the government's case a transcript of a phone call between Herschel Weintrub and Sam Harris was introduced. Harris told Weintrub of the arrest of someone referred to as Tennessee and indicated that he (Harris) was lying low. The conversation continued, as set out below, to discuss his debt to Weintrub for $440 for rings, winding up with an interesting prophecy:

SH I ain't even going to worry about it, I was, I went and seen my lawyer . . .

HW Yeah.

SH you know, ah . . .

HW Uh-huh.

SH went to see him the day before the elections . . .

HW Um-hum.

SH and he told me, if, you know, if it's gonna happen, it's gonna happen, not even to worry about it . . .

HW  Yeah.

SH  and not to say nothing to anybody, don't talk over no phones to anybody, you know, and, ah . . .

HW  Um-hum.

SH  and not to discuss anything . . .

HW  Yeah, well listen . . .

SH  if they come and get me, just, go ahead, and, ah, and, ah, call him, and not to say nothing, sign nothing, or do nothing . . .

HW  Do nothing.

SH  just tell em your name, if they want fingerprints, you'll let em . . .

HW  Name, face and serial number.

SH  Yeah, that's what he said . . .

HW  Yeah.

SH  the only thing you sign is the fingerprint card

.    .    .    .    .

HW  Yeah.

SH  and he said that's it . . .

HW  Yeah.

SH  and he said call me right now.

HW  Yeah, OK.

SH  So, I don't know, I never, ah, heard nothing or anything . . .

HW  Yeah.

SH  you know, I'm just staying home.

HW  Well, that's good, stay home, collect unemployment or something.

SH  That's what I'm gonna do, I'm, just, I don't know if I can collect any fuckin unemployment, but I'm staying home.

HW  Yeah.

SH  *That other stuff, though, you know, ah, on that ring, that money, what'd I owe you, four forty yet?*

HW  *Yeah.*

SH  *I'll, I'll have that together for ya, because, ah, I took them rings, and, ah, I'm gonna give em to, you know, another guy.*

HW  *Um-hum.*

SH  *And see if he can peddle em to somebody so I don't have to get* . . .

HW  *Yeah, get rid of em all at once.*

SH  Right.

HW  OK.

SH  Let it go at that . . .

HW  All right.

SH  get out of debt, and see what happens.

HW  Yeah, well, let me know what goes, I was just calling to kibitz (phonetic).

SH  Nah, I think, ah, see, ah, you were real, real fortunate, you know, not having any dealings with this bastard . . .

HW  Yeah.

SH  In any way, shape or form, I don't know if I have or not.

HW  I don't think you have. I hope not.

SH  I do, too, but . . .

HW  Yeah.

SH  you know, I'm gonna, if I do, I'm going to fight mine right to the end of it.

HW  Oh, hell yeah.

SH  Fuck with it, I'll stay around 3 or 4 years on appeal.

(Emphasis added.)

Subsequently, Harris testified on his own behalf at the trial of this case and was asked about the conversation just quoted:

Q. You also stated that you still owed on a ring $440, and that you would have it together. What did you mean by that sentence?

A. *It could have meant heroin or it could have meant jewelry because I did sell some jewelry for him, and I just don't know which it meant because we had a way of everything getting jammed into one thing. Like if he would give me some watches or jewelry or something to hustle, sell, he might just add it in with what was the balance on the dope transaction. I don't really recall which way it was.* (Emphasis added.)

The District Judge doubtless considered the quoted government evidence on the motion to dismiss the indictment. The jury had both portions of evidence quoted from the transcript before it on the issue of proof beyond reasonable doubt.

Illustrative also of how much integration there was in the various subsidiary aspects of this enterprise is Government Exhibit

# 350, a red bound ledger book seized under search warrant in appellant Hensley's house. The ledger obviously is a price list on stolen items garnered by Hensley's 12 burglary teams. On the first few pages of the ledger there are 12 names and telephone numbers. Although one is identified only by a nickname and several are identified by first names only, or last names only, or in one instance by initials, there is a strong inference that Hensley thought each of these was a person whom he was likely to call in relation to disposition of the stolen goods. Three of the defendants in this case can easily be identified: "Carl," "Hershell [sic]," and "T. Hill," another co-conspirator in this case as to whom trial was severed and who now has been found guilty and sentenced. In sum total the individual items number 385 and cover 33 pages of the ledger. They include many pieces of jewelry, many stolen firearms, a significant number of pieces of clothing, some building materials, a complete coin collection, television sets, microwave ovens and miscellaneous household furnishing. Beside various of these items are names, some with notations like "Otis kept," apparently applicable to one Quasar 19 inch with the notation "brought back, no good." The total number of individual names, many of them appearing numerous times, is 24.

The point we make by reference to this exhibit is that 1) the fencing aspect of the enterprise—although clearly subsidiary to the heroin distribution scheme—was substantial; 2) was operated in connection with all three of the executive group of the enterprise (Weintrub, Adams and Sutton), and 3) involved a substantial number of operatives other than Hensley.

Viola Holmes not only operated as a drug courier for Sutton in Cincinnati and the Cleveland drug source maintained by appellants Elkins and Carter, she also, in effect, ran a subheadquarters for the Weintrub-Adams-Sutton executive group at her home. Prince Albert Rankin frequently talked with Carl Sutton on Viola Holmes' phone and Herschel Weintrub used it to talk with Charles Craven, usually on calls relating to the purchase and sale of heroin.

Federal agents also observed Rankin and Sutton on a visit to the Holmes house on November 14, 1976:

Q. Mr. Stuart, calling your attention to November 14, 1976, did you have occasion to conduct a physical surveillance that day?

A. Yes, sir, I did.

Q. Where was your surveillance located?

A. In the vicinity of 6753 Bellkenton Avenue, Silverton.

Q. And around 5:00 o'clock in the evening, what if anything did you see?

A. Sir, at approximately 5:07 P.M., I observed a black Cadillac Eldorado pull up in front of the residence at Bellkenton, honk the horn a couple times, and then the vehicle continued on a short way and pulled into the driveway of Viola Holmes' residence. I then observed a male Negro who I later was able to identify as Prince Albert Rankin get out of the Cadillac and walk up to the porch of the residence. He was there and then almost immediately turned around and walked back toward his car.

Then I heard him say, "Do you want me to pull in the back, Carl?"

I didn't hear any response.

Rankin got into the Cadillac and pulled the car back behind the residence in the driveway.

The male Negro I know now as Prince Albert Rankin and a female who I don't know got out and went in the rear of the residence.

Q. Were you able to see what occurred inside the residence?

A. No, sir, I was not.

Q. Did you observe the Cadillac leave at any time that day?

A. Yes, sir. Later in the evening the vehicle left and I didn't see it. I moved my surveillance position at about 5:55 P.M. It took me about three or four minutes to get from the one location to the second location, and when I got to the second location, the Cadillac which had been parked in the driveway, Rankin's

Cadillac, was gone. I did not actually see him pull out.

Q. Did you ever see it come back that evening?

A. Yes, sir. At approximately 6:35 P.M., I observed this same Cadillac pull back into the driveway of the residence. He parked partway back in the driveway. Sutton got out of the passenger side of the car and went into the back of the residence. The black Cadillac then with Rankin and a female in it backed out of the driveway and then drove down Bellkenton out of my sight.

Sutton and Rankin's conversations were not, however, limited strictly to heroin dealing, as indicated by the search warrant intercepted conversation on Viola Holmes' phone between Prince Albert Rankin and Carl Sutton:

PAR—Prince Albert Rankin; CS—Carl Sutton

CS Yea.

PAR This is Chuck.

CS Yea, what's happenin?

PAR Nothin, man.

CS Ain't nothin wrong?

PAR No, ain't nothin wrong.

CS Okay.

PAR Uh, you ...

CS I know what you're talking about. Tomorrow, I was just told today, tomorrow. Okay?

PAR That ain't the syrup, is it?

CS Well, no, other thing you was talking about, yea.

PAR Right, yea.

CS That's how come I didn't mention anything to ya the other day, ya know.

PAR Okay.

CS Okay. Soon as they hit me, I'll hit you.

PAR Alright, I can use that, you know, man.

CS It will keep your thing together, ya know.

PAR Yea, cause you know, I can't ...

CS I know what ya mean. I know what ya mean.

PAR I done drank up all of the syrup trying to get rid of this cold, Carl.

CS You're jivin.

PAR I ain't jivin.

CS Damn, I called ya the other day. You must a been asleep.

PAR *Hey, ya know, uh (inaudible) woke up, but I wanted to see about some stereo equipment.*

CS *A huh.*

PAR *You know, and that stuff had me hung up pretty long. Got it in and it wasn't right then. And now I gotta take it back.*

CS *I see. You shoulda called me. I would have come over and did it for ya.*

PAR *Ah, ya know how bad I am with this stuff.*

CS *You still got it over there?*

PAR *Yea. But what it is, it's uh, one of my phono channels, or fuse blowed or somethin. I don't know. Somethin. I just take the whole thing back to the, uh, I'm going to take the amp, ya know.*

CS *Oh, okay. What kinda amp is it, Chuck?*

PAR *Sony.*

CS *Yea, that's a good one.*

PAR *4 channels, you know, and quad.*

CS *Yeah.*

PAR *So I'm just going to take it back and let them handle it.*

CS *OK.*

PAR (Inaudible) so I'll just wait.

CS Hey, no problem, ya know.

PAR You know, as much as I can get.

CS OK, cool.

PAR Alright.

CS Okay.

PAR I'll talk to ya. Thank ya.

CS Okay, buddy. Bye.

(Emphasis added.)

Pages 2862–64 of the transcript record conversation between Herschel Weintrub and Carl Sutton in which they discuss three separate Sutton ring transactions, two being with Ed Adams.

On November 15, 1976, appellants Weintrub and Sutton, after a conversation which

obviously concerned heroin, had the following exchange:

HW  Okay, then I know how far I can go, see.

CS  Okay.

HW  Okay. I'll see ya later.

CS  Okay.

HW  *Oh, listen, I got the watches and stuff. I got your toothpick and I got the crystal. So I'll see ya within uh, about 9 o'clock.*

CS  *Oh, yes.*

HW  *Is that alright?*

CS  *Yea. Won't be not later than that, will ya?*

HW  *No, no, I'm in town now and just tryin to get outa here.*

CS  *Okay.*

(Emphasis added.)

Following is the testimony of Viola Holmes pertaining to Carl Sutton's sales of rings, watches and furniture. Other portions of this indicate that she was seeking to be exculpatory both as to herself and Sutton in this testimony, but it represents evidence which the jury could have considered with other evidence to conclude that Sutton, with Holmes' full knowledge, was engaged in fact in selling stolen property for the fencing scheme involved in this indictment:

Q.  Okay. Now, do you know whether or not Carl Sutton ever sold rings or watches?

A.  Yes.

Q.  Did you all discuss this?

A.  Not a great deal, but I know that he sold rings and watches, jewelry for Herschel Weintrub.

Q.  All right. Now, in connection with his selling of jewelry or selling of furniture, did you on any occasion collect any money for him?

A.  Yes.

Q.  How did that happen?

A.  Well, maybe Carl would call somebody or somebody would call him, and he had to go somewhere else, maybe he would have to go sell somebody else furniture, and he wasn't going to be there and they would want to bring like some of their money or whatever, and that is how it would happen.

This record also described surveillance of Viola Holmes' residence at 6753 Bellkenton Avenue and an observation of Carl Sutton and Viola Holmes leaving the residence in Sutton's automobile, and Weintrub arriving and going into the house with a key. He came out, locked the door, and carried away a small package. The date involved was October 29, 1976, in the afternoon and evening.

There is also a record of a surveillance on the first of November 1976 where Carl Sutton appeared at the residence briefly and Viola Holmes appeared and went into the house. Sutton and two other persons placed three boxes in the trunk of Sutton's Ford automobile.

About 8:10 p. m. a 1976 Cadillac arrived containing Armentrus Glenn and Charles Craven who entered the residence. Craven was identified by the agent as being in the courtroom. They went into the house at 8:30; Weintrub came and was admitted by Carl Sutton. They remained at the Holmes' residence until at least 9:10 p. m.

On the occasion of the arrest of Rankin and a court-ordered search of Rankin's house, the agents found both heroin and drug supplies and appliances which were introduced at this trial. They also seized at the house and introduced into evidence a sales agreement for a 1976 Cadillac, showing cash paid by Rankin in the sum of $13,750.

The name Prince Albert Rankin answered to and was known by in this enterprise was "Chuck" or "Chuckie." This name was found in Hensley's ledger of stolen goods (Exhibit 350) four times—once beside a roofing ladder, twice beside lists of shotguns, and once beside a list of three diamond rings.

The following portion of the record is Agent Roberts' testimony concerning the search of Charles Craven's apartment under a federally issued search warrant. Seized was government's Exhibit 120, described as

several packages of a white powdery substance found in a brief case underneath Craven's bed. Seized also were a number of plastic envelopes constituting Exhibit 121, which also contained a white powdery substance which was subsequently analyzed. Seized also was a book called a diary, Exhibit 126, containing names and dollar amounts of money next to them and an appointment book, Exhibit 127, and a ledger, Exhibit 128, two special bound pads, Exhibits 129 and 130. Exhibit 139(a) is an exhibit described on page 3566 as a single piece of paper containing a number of names with dollar amounts listed underneath $2,400, taken from Craven's brief case. Exhibit 55 is a plastic-sealed envelope containing a white powdery substance, taken from the kitchen of Mr. Craven's apartment and Exhibit 56 is bottles containing quinine sulfate capsules. There was expert testimony to the effect that these capsules were often used to cut heroin.

This evidence was introduced by the government to help substantiate the nature of the telephone conversations which were the subject of Craven's six felony convictions on substantive counts:

Q. Agent Roberts, referring your attention to December 8, 1976, did you search the apartment of Charles Craven at 3619 Clarion Avenue, Apartment 10, pursuant to a federal search warrant?

A. I did.

Q. Did you seize any items?

A. Yes.

\* \* \* \* \* \*

Q. Agent Roberts, can you describe the contents of Government Exhibit 120?

A. Yes. It contains inside this plastic envelope a package, or several packages of a white powdery substance. The packages are initialed by me and dated.

Q. And were those contents seized on December 8, 1976, from the apartment of Mr. Craven?

A. That's correct, they were seized inside a briefcase underneath his bed.

Q. And do you recall where the briefcase was located?

A. In the bedroom underneath his bed was the briefcase.

Q. And what did you do with the contents of Government Exhibit 120?

A. Well, they stayed in my custody until returning to our office at which time they were sealed, again initialed, and turned over to the Drug people.

Q. When you say they were initialed, was it with your initials?

A. That's correct.

Q. Could we please see Government Exhibit 121?

(Government Exhibit 121 handed to the witness.)

Referring your attention to Government Exhibit 121, can you describe the contents of this exhibit?

A. Yes. It contains a number of plastic or glassine type envelopes, I guess you would call them, and two packages which are sealed containing another white powdery substance which is also initialed and dated by me.

Q. Were these items seized on December 8, 1976, from the apartment of Mr. Craven?

A. That's right, they were also taken from his briefcase, I believe.

Q. Now, what if anything did you do with the contents of that exhibit after you seized it?

A. These also remained in my custody until I returned to the office at which time they were again sealed and turned over to the Drug people for analysis.

Q. Could we please see Government Exhibit 122?

(Government Exhibit 122 handed to the witness.)

Mrs. Anderson, if you have a pencil, I can give you the rest of the exhibits that we will need for this witness, and it might save a little time. We will need Exhibits 123 through 132, 55, 56, 58 and 59, 139 and 139–A.

Mr. Roberts, can you describe Government Exhibit 122?

A. Yes. It is a plastic sealing device which was seized from Mr. Craven's kitchen on the day of the search in December. My initials are scratched on the device as well as the bag containing it.

Q. May we have Exhibit 123, please?

(Government Exhibit 123 handed to the witness.)

Agent Roberts, can you identify Government Exhibit 123?

A. Yes, it is a cardboard box containing little envelopes that are initialed and dated by me.

Q. And where was that found?

A. These were also found in Mr. Craven's residence, I believe in the bedroom.

Q. Would you take a look at Government Exhibit 124?

(Government Exhibit 124 handed to the witness.)

I will ask you if you can describe the contents of Government Exhibit 124?

A. Yes, these are piece of evidence seized from the briefcase which we found under Mr. Craven's bed. It contains a box labeled glassine envelopes, another box containing small boilable cooking pouches, some loose glassine envelopes, a box of prophylactics, and a smaller package containing little paper envelopes.

Q. Were all the contents of Government Exhibit 124 seized from Mr. Craven's apartment on December 8, 1976?

A. That's correct, they were. There is also a deck of cards, playing cards.

Q. Will you take a look at Government Exhibit 125?

(Government Exhibit 125 handed to the witness.)

I will ask you if you can identify that?

A. It is a book which was taken from Mr. Craven's apartment, initialed and dated by me on the first page here, containing figures.

Q. And was that book seized on December 8, 1976?

A. That's right, it was.

Q. Would you take a look at Government Exhibits 126 through 130?

(Government Exhibits 126 through 130 handed to the witness.)

A. Exhibit 126 is a book that says "Diary" on the cover, and it is initialed and dated by me. It contains names and dollar amounts of money next to the names.

Q. From where was that seized?

A. This was taken from the bedroom.

Q. Of whose apartment?

A. From Mr. Craven's apartment.

Q. And on the same date we have been discussing?

A. That's correct.

Exhibit 127 is an appointment book that is initialed and dated by me, and it appears to have names with figures next to them. This was also taken from the bedroom of Mr. Craven's apartment on December 8.

Q. What is Government Exhibit 128?

A. Exhibit 128 is a book entitled, "Ledger" it looks like, and it has been initialed and dated by me, and it was taken from Mr. Craven's apartment on December 8. It also contains numbers. There is a calendar here on several pages, and there are names similar to the first three.

Q. Would you look at Government Exhibits 129 and 130?

A. Okay. May I take them from the envelope, sir?

Q. Yes.

A. These are sealed up.

This is a small spiral-bound pad dated and initialed by me on December 8. It is open to a page containing numbers and names, and it was taken also from the apartment of Mr. Craven.

Q. Again pursuant to the same search warrant on December 8, 1976?

A. That's correct.

Q. What is Government Exhibit 130?

A. Exhibit 130 is also a spiral-bound pad. It is initialed and dated by me, and it also contains names and numbers and ap-

parently phone numbers, and it was taken from the apartment of Mr. Craven on December 8.

\* \* \* \* \* \*

Would the clerk please hand the witness Government Exhibits 139 and 139–A?

(Government Exhibits 139 and 139–A handed to the witness.)

A. Exhibit 139 is the briefcase which I seized from under Mr. Craven's bed. It is initialed by me. This was the briefcase containing the white powdery substance that I previously identified and several of the other articles here.

Q. And was that seized on December 8, 1976?

A. This was seized from his residence on that date, that's correct, from underneath his bed.

Q. Would you take a look at Government Exhibit 139–A? I will ask you if you can identify that?

A. This is just a single piece of paper for a small notebook initialed and dated by me on the rear, on the back side of it. On the front side it contains a number of names with dollar amounts listed underneath them and a total on the bottom of apparently $2400. That was also taken from the briefcase.

Q. Would the clerk please hand the witness Government Exhibits 55, 56, 58 and 59?

(Government Exhibits 55, 56, 58 and 59 handed to the witness.)

Agent Roberts, can you describe Government Exhibit 55?

A. Yes, it is a plastic-sealed envelope. It looks like it contains a white powdery substance. It is initialed and dated by me, and it was taken from the kitchen of Mr. Craven's apartment.

Q. After you seized those particular items, what if anything did you do with them?

A. Did you want this one also identified?

Q. That's all right. Continue with Exhibit 55.

A. These items were again maintained in my custody and control until they were returned to our office, and at that time they were turned over to the Drug people for analysis.

Q. I take it when you say these exhibits, that you are referring to Government Exhibit 56.

A. That's correct. Exhibit 56 is two bottles. They have a label on the front stating that they are quinine sulfate capsules. The backs of the bottles are initialed by me and dated with a notation that these were obtained from the briefcase of Mr. Craven, and again these remained in my custody until returning to the office.

Q. Agent Roberts, I would like you to identify Government Exhibits 58 and 59, please.

(Government Exhibits 58 and 59 handed to the witness.)

A. These are both bottles with a label appearing on the front indicating that they are lactose, one-pound jars of lactose, and they are initialed and dated by me, and these were taken from the kitchen of Mr. Craven on the day of the search, December 8.

Q. And were they kept in your custody and control?

A. That's correct, they were kept in my custody until returning to the office.

The record in this case discloses that Charles Craven was observed on six separate occasions at the residence of Viola Holmes, once in the company of Carl Sutton.

Following is testimony by Agent Owens concerning a $3,000 debt for heroin which James Pieratt owed Appellant Adams:

A. During this conversation, Mr. Adams indicated to me that he was quite concerned because a fellow from Middletown named James Pieratt owed him approximately $3,000 for heroin which he had fronted to him, and he stated that Pieratt had encountered some problem with the law and wasn't going to be in a position to pay him.

However; he indicated to me that he wasn't overly concerned because he was holding certain stolen property that belonged to Pieratt which he was going to be able to dispose of and offset part of the $3,000 that was owed to him.

As I recall, the items which he said he was holding that Mr. Pieratt had given him was a brown diamond of some sort that had been taken in a burglary, a Sony television set which he indicated was in a room on the second floor of his house, and a quantity of monogrammed silver, silver service, which he was going to melt down and sell to the refinery.

Weintrub also set up a successful burglary of a house of one of his neighbors for Ed Lawell in order for Lawell to be able to pay a $12,000 heroin debt to him (Weintrub).

Appellant Hensley, with the close cooperation of Herschel Weintrub and Edwin Adams, perpetrated a fraud upon Nationwide Insurance Company of Columbus, Ohio, by dint of procuring from Weintrub and Adams fictitious receipts for the purchases of items from their jewelry stores. Hensley submitted these receipts to support his claim of ownership of and to establish the value for certain property which he claimed to have been stolen from his house in a burglary. The nature of this fraud and who got the money is undisputed in this record. It is of particular significance at this point because the scheme was designed by Herschel Weintrub in order to provide Hensley a method of paying Weintrub $575 which Hensley owed Weintrub for heroin. Weintrub filed a claim with Nationwide for this amount and received $575 of the total fraudulent payment personally by check to repay him for heroin purchases.

The following testimony shows that Adams sold heroin and a rifle at the same time to Sergeant Arkenau while Arkenau was posing as a dope peddler:

Q. Did you eventually purchase anything?

A. Yes, I did. After examining the heroin, the white powder that appeared to be heroin to me, I agreed to purchase that tablespoon for $350, and I agreed on the rifle for $30. I gave Edwin Adams $380 for both items.

The point we are making with all of this evidence is that there was ample reason for the judge and jury to conclude that this was a highly integrated enterprise. All nine of the appellants worked continually in close association in "the main thing" of the enterprise—the marketing of heroin. Seven of the nine, Adams, Sutton, Hensley, Harris, Rankin, Holmes and Craven, were directly involved in the subsidiary stolen goods fencing aspect of the enterprise, or in the case of Rankin and Craven, were intimately familiar with it.

Appellants Carter and Elkin were the heroin suppliers for "the main thing" of the enterprise and benefited directly from its subsidiary fencing and mail fraud operations.

This exhaustive evidentiary record offered the judge and jury in this case proof of every aspect of the 75–page indictment.

## III. THE PREJUDICIAL MISJOINDER CLAIMS

■ Appellants claim that Federal Rules of Criminal Procedure 8 and 14 [8] pertaining

---

8. **JOINDER OF OFFENSES AND OF DEFENDANTS**

(a) **Joinder of Offenses.** Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) **Joinder of Defendants.** Two or more defendants may be charged in the same in-

dictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8.

**RELIEF FROM PREJUDICIAL JOINDER**

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or

to joinder have been violated by this trial of nine defendants on 268 counts. The majority of the original panel found prejudicial misjoinder under these rules after the Title IX counts were invalidated following its interpretation of that statute. This reason for finding prejudicial misjoinder, of course, disappears when the statute is interpreted as it was written and, we believe, intended. This is particularly true in this case, since the indictment charged and the jury found all nine defendants guilty on both of the Title IX counts, and on at least three drug related offenses.

There is no doubt that extensive traffic in illegal drugs was the principal business of this illegal conspiracy, or that all defendants were engaged in it to a greater or lesser degree. The indictment, of course, also charged that a major subsidiary purpose was the fencing and distribution of stolen goods which had moved in interstate commerce. The defendants who were engaged primarily in this latter activity were shown to be associated in the stolen goods operation directly with one or more of the conspiracy's principals, Weintrub, Sutton and Adams. Thus the jury had evidence to find that all nine of the defendants had knowledge of and participated in the central conspiracy while some of the defendants were also parties to varying aspects of the subsidiary schemes of fencing and distribution of stolen goods in interstate commerce.

The claim of prejudicial joinder was advanced early in this prosecution. The indictment named 37 persons who were charged upon 329 counts. The District Court, through another judge, recognized the possible prejudice to some who might prove to be remote from the center of the conspiracy charged and ordered severance of 10 defendants for purposes of the instant trial. The District Judge who tried this case received motions for severance on grounds of prejudicial misjoinder and responded by severing the trial of one of the 10, Thomas Hill.[9]

As Judge Engel pointed out in dissent in the panel decision, the Supreme Court in *Schaffer v. United States*, 362 U.S. 511, 514–17, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960), refused to reverse convictions under Fed.R.Crim.P. 14 for misjoinder when the government's indictment had been drawn in good faith and no prejudice was shown. On the facts previously described, we find it impossible to hold that this indictment was laid or prosecuted in bad faith or that the District Judge abused his discretion in failing to find prejudice and grant further severance.

## IV. THE JURY CHARGE

Appellants also contend that a new trial should be granted because in his jury instructions the District Judge instructed upon "five separate conspiracies." The disputed charge is as follows:

Although the indictment charges a single conspiracy, it would be possible for you to find the following separate conspiracies:

A conspiracy to engage in a racketeering enterprise;

A conspiracy to engage in distribution of controlled substances;

A conspiracy to engage in interstate transportation of stolen property;

A conspiracy to engage in receipt of stolen property transported in interstate commerce; or

A conspiracy to engage in mail fraud.

Whether there was one conspiracy, five conspiracies, or no conspiracy at all is a fact for you to determine from the evidence.

---

information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.
Fed.R.Crim.P. 14.

9. Hill has now been tried separately and convicted. His appeal is pending in this court.

I have previously instructed you as to the consideration to be given acts or statements of one alleged conspirator against another alleged conspirator. You may not consider any such act or statements against any defendant unless you find beyond a reasonable doubt that the person doing the act or making the statement was a member of the same conspiracy as was such defendant.

Standing alone, this charge might be error, since the indictment charged one Title IX "enterprise" conducted or participated in by all defendants through interstate racketeering.

At the outset of his charge, the District Judge charged, in the words of the indictment:

All defendants are charged in Count 1 of the indictment, beginning sometime before May 6, 1976, and continuing until on or about July 1, 1977, in the Southern District of Ohio, with unlawfully, willfully and knowingly combining, *conspiring* and confederating together as defendants with other persons named in the indictment to commit offenses against the United States as follows:

To knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of an enterprise which was engaged in and the activities of which affected interstate commerce. Said enterprise being an unlawful business enterprise engaged in (1) distribution of controlled substances; (2) interstate transportation of stolen property; (3) receipt of stolen property transported in interstate commerce; and (4) mail fraud.

(Emphasis added.)

Subsequently, the District Judge charged:

The indictment charges *a conspiracy* among the defendants, Carl Sutton, Jr., Joseph Spinoza Elkins, Dyeatra Ann Carter, Edwin Arthur Adams, Otis Hensley, Commadore Perry Harrison, Samuel Lee Harris, Charles Edward Craven, Viola Holmes, and Prince Albert Rankin, III. The indictment further charges *a conspiracy* among these and other defendants

not presently on trial and among other persons who are unindicted co-conspirators.

A person cannot conspire with himself and therefore you cannot find any of the defendants guilty unless you find beyond a reasonable doubt that he or she participated *in a conspiracy as charged* with at least one other person, whether named in the indictment or not.

A defendant may be held responsible for original acts of conspirators occurring prior to the time he joined the conspiracy if by his participation he has committed such acts in furtherance of the conspiracy that would lead you to believe that he adopted the conspiracy after it was underway.

In deciding whether a particular defendant was a member of *the conspiracy*, you should consider whether on all the evidence, the defendant knowingly and purposely entered *the conspiracy*.

(Emphasis added.)

We find no reversible error in the disputed portion of the District Judge's charge. The indictment clearly charged a conspiracy to engage in a racketeering enterprise. It also charged that that enterprise was engaged in distribution of controlled substances, interstate transportation of stolen property, receipt of stolen property transported in interstate commerce, and mail fraud. We read Judge Rubin's generally full and fair charge in this case as seeking in this instance to deny the prosecution the benefit of hearsay evidence as to any defendant, except where the conspirator whose act or statement is under consideration was participating in the same racketeering activity as the particular defendant was participating in. While this precautionary charge may not have been necessary, we do not believe that it served to prejudice the rights of the defendants in this case.

## V. OTHER ISSUES

Various of the appellants contend that the affidavits filed by the United States

with the applications for search warrants for either telephone interceptions or search of buildings or cars were inadequate for establishment of probable cause. We have reviewed these claims and reject them. The information furnished the Magistrate was ample for establishment of probable cause in all instances.

Appellants Carter and Elkins contend that reversible error was committed when the District Judge allowed the jury to hear the following questions and answers addressed to Dyeatra Carter:

Q  Aren't you really talking about George Webb in this conversation?

A  No, I am not.

Q  Isn't George Webb your connection for heroin on the West Coast?

A  ... No, he is not.

Q  George Webb's phone number was found in your address book when your premises were searched wasn't it?

A  In my book, it said George Webb Construction Company, Los Angeles, California.

Q  *Aren't you aware that George Webb is a heroin distribution?*

A  No, I am not.

(Emphasis supplied.)

Appellants argue that the questions were highly prejudicial and that the prosecutor had no basis for them. The prosecution argues that George Webb's name had been found in a search of Dyeatra Carter's apartment. He also argued to the District Judge that George Webb had been indicted in California as a drug dealer.

After first admitting these questions and answers, the District Judge subsequently told the jury that they were not "probative" and should be completely disregarded. Careful consideration of this issue convinces us that the initial admission of this material did not constitute reversible error. The telephone number of the George Webb Construction Company in Los Angeles, California, had been found in appellant Carter's address book. The logic of a normal business relationship between the Carter Exterminating Company in Cleveland, Ohio, and

the George Webb Construction Company of Los Angeles, California, does not easily come to mind. The fact that George Webb had been indicted in California does not, of course, prove anything more than that a United States Attorney felt he had probable cause to bring a charge and a Grand Jury agreed. But these facts do serve to rebut the possibility that interjection of this issue was prosecutorial abuse.

Our review of the evidence which in this case involved Carter's own testimony on direct and cross-examination convinces us, as it did the jury, that the proofs of her complicity in this drug conspiracy were overwhelming. Any impact on the jury remaining after the District Judge's curative charge we regard as harmless under Rule 52 of the Federal Rules of Criminal Procedure.

Appellant Elkins' claim that appellant Carter's disastrous testimony infringed *his* Fifth Amendment rights, we regard as frivolous.

Appellant Harris claims the right to a new trial because his privately retained lawyer was at the time of his trial also "the family attorney" for an FBI Agent who was involved in investigation of this case. The prejudice arising from this fact he asserts is demonstrated by his attorney's failure to move for severance of his case. Since we have rejected the claims of all appellants who raise the severance issue, we find no prejudice requiring reversal in this argument.

Our review of this record discloses no other appellate issues which merit discussion at this time.

## VI. SENTENCING

In the Appendix which follows this opinion are set forth the sentences which have been administered to the various defendants previously discussed. The crimes for which these nine appellants have been convicted are serious offenses. The sentences are extremely severe. Appellants claim that their sentences are arbitrary and un-

constitutionally excessive. Under them seven of the nine defendants might well spend their entire lives in prison.

To date, however, these sentences are not final. After the appellate process has terminated, motions for reductions of sentences under Rule 35 of the Federal Rules of Criminal Procedure may be filed and decided "within 120 days after receipt by the [sentencing] court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding, a judgment of conviction." Fed.R.Crim.P. 35(b).

In all instances, except one, the sentences administered appear to be within the statutory authorization, but the use herein of maximum terms and consecutive sentences for multiple counts can create unjust results. We will, however, await the District Court's decision on such Rule 35 motions as may be made before reviewing appellants' claim of arbitrary or unconstitutionally excessive sentencing.[10]

■ The exception to the facial validity of the sentences arises from the fact that while the District Judge made the sentences for participating in or conducting an enterprise engaged in interstate commerce through a pattern of racketeering activity under Title IX, 18 U.S.C. § 1962(c) (1976), and conspiring to do the same under Title IX, 18 U.S.C. § 1962(d), concurrent in a number of instances, in a number of others, he failed to do so. It is apparent to us that §§ 1962(c) and 1962(d) under the holdings of the Supreme Court in *Ianelli v. United States, supra,* validate the indictment of these appellants under both sections. Nonetheless, we hold that the proofs in this record showing these defendants violated § 1962(c) and § 1962(d) were identical. Under these circumstances, we believe that the conspiracy convictions under § 1962(d)

merge with the § 1962(c) convictions for purposes of sentence. In all instances where a sentence on § 1962(d) has been made consecutive to a sentence on § 1962(c), the sentences for violating § 1962(d) are hereby vacated and remanded to the District Court for entry of sentences on § 1962(d) concurrent with those imposed for violations of § 1962(c).

In all other respects, the judgments of convictions are affirmed.

## APPENDIX

The appellants were individually sentenced as follows:

Appellant CARL SUTTON, JR., was sentenced to 20 years for conducting an enterprise through a pattern of racketeering, in violation of 18 U.S.C. § 1962(c) (1976) (RICO violation), and 20 years for conspiracy to commit that offense, 18 U.S.C. § 1962(d) (1976) (RICO conspiracy), the sentences to run concurrently. Sutton was also sentenced to 15 years and three years special parole on each of 20 counts of distributing a controlled substance, in violation of 21 U.S.C. § 841(a)(1) (1976). The sentences on two of these counts are to run consecutively to each other and consecutive to the RICO sentences; the other sentences are concurrent. Sutton also received sentences of 15 years each on 21 counts of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1976). Two of these sentences are consecutive to each other and to the other sentences imposed; the remainder are concurrent. Finally, Sutton was sentenced to four years on each of 63 counts of using a telephone to facilitate drug offenses, in violation of 18 U.S.C. § 843(b) (1976). Three of these sentences are consecutive to each other and to the other sentences imposed; the remainder are concurrent. Sutton was also fined $10,000 for each of the

---

10. *See, e. g., Downey v. Perini,* 518 F.2d 1288 (6th Cir.), *vacated,* 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); *United States v. Lowe,* 482 F.2d 1357 (6th Cir. 1973); *United States v. Daniels,* 446 F.2d 967 (6th Cir. 1971); *United States v. Latimer,* 415 F.2d 1288 (6th Cir. 1969);

*United States v. West Coast News Co.,* 357 F.2d 855 (6th Cir. 1966), *rev'd on other grounds, Aday v. United States,* 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967). *See also* 28 U.S.C. § 2106 (1976).

RICO offenses and $5,000 each for 16 of the drug distribution offenses. Sutton's total sentence is thus 92 years imprisonment and a $100,000 fine.

JOSEPH S. ELKINS received 20 years imprisonment for each of the RICO offenses, the sentences to run consecutively. Elkins also received 15 years and three years special parole for distribution of a controlled substance, to run consecutively to the other sentences imposed, and 15 years and three years special parole for each of eight counts of possession of a controlled substance with intent to distribute; the sentences to be concurrent with each other, but consecutive to the sentences imposed for other offenses. Elkins was additionally sentenced to four years on each of three counts of use of a telephone to facilitate drug offenses, such sentences to be consecutive to each other and to the other sentences imposed. Elkins' total sentence is 82 years.

DYEATRA ANN CARTER was sentenced to 20 years for both of the RICO offenses, to run consecutively. She also received 15 years for distribution of a controlled substance, together with three years special parole, such sentence to run consecutively, and 15 years with three years special parole on each of eight counts of possession of a controlled substance, such sentences to run concurrently with each other, but consecutively to sentences for other offenses. Carter also was sentenced to four years each on three counts of use of a telephone to facilitate a drug offense, the sentences to run consecutively to each other and to all other sentences. Carter's total sentence is 82 years.

PRINCE ALBERT RANKIN was sentenced to 10 years on both of the RICO offenses, the sentences to run concurrently. Rankin was sentenced to 15 years each and three years special parole on five counts of possession of a controlled substance with intent to distribute. The sentences on two of those counts are consecutive with each other and with the other sentences; the sentences on the other three possession counts are concurrent. Rankin also re-

ceived consecutive four-year sentences on five counts of use of a telephone to facilitate drug offenses; he also received four additional concurrent four-year sentences for use of the telephone for drug dealing. These sentences were all imposed consecutively to the sentences imposed by the State of Ohio and presently being served by the appellant. Rankins' total federal sentence is 60 years.

EDWIN ARTHUR ADAMS was sentenced to 20 years each on both of the RICO offenses, to be served concurrently. In addition, Adams was sentenced to 10 years each on two counts of transporting and receiving stolen property, in violation of 18 U.S.C. §§ 2314–15 (1976), to run concurrent with each other, but consecutive to other sentences imposed. Adams received 14 sentences of 10 years, to run concurrently with each other, but consecutively to other sentences imposed, on 14 counts of distribution of a controlled substance. Adams also received 10 years on each of 11 counts of possession of a controlled substance with intent to distribute, to run concurrently with each other, but consecutively to other sentences, and an additional five-year concurrent sentence on another count of possession. He was sentenced to 10 years on each of seven counts of mail fraud, in violation of 18 U.S.C. § 1341 (1976), the sentences to run concurrently with each other, but consecutively to other sentences imposed. Lastly, Adams was sentenced to four years on each of 56 counts of using a telephone to facilitate drug trafficking, seven counts of which are to run consecutively to each other and the other sentences, and the balance of which are to run concurrently with each other and the other sentences imposed. Adams was also fined $25,000 for each of the RICO offenses, $10,000 for each of the mail fraud offenses, and $10,000 each for 13 drug offenses. Adams' total sentence is 93 years and a $200,000 fine.

OTIS HENSLEY was sentenced to 10 years for both the RICO offenses, to run consecutively. He was sentenced to 15 years and three years special parole on three counts of distribution of a controlled

substance, to run concurrent with each other but consecutive to other sentences, and five years on each of 14 counts of unlicensed firearms dealing and receipt of a firearm by a convicted felon, the sentences to run consecutively on two of the counts and concurrently on the remainder. Hensley was also sentenced to five years each on eight counts of mail fraud, the sentences on three of those counts to be consecutive to each other and to the other sentences previously imposed, the remainder to be concurrent. Lastly, Hensley was sentenced to four years on each of five counts of distribution of a controlled substance, the sentences to be served concurrently with each other, but consecutively to the other sentences imposed. In addition, Hensley was fined $10,000 for each RICO offense, $10,000 for each drug offense, $5,000 each for unlicensed firearms dealing and five counts of using a telephone to facilitate drug dealing, and $2,000 each for 10 counts of receipt of firearms by a convicted felon. Hensley's total sentence is 64 years and a $100,000 fine.

SAMUEL HARRIS was sentenced to 10 years on both RICO counts, to be served concurrently. He received 15 years for each of two counts of distribution of a controlled substance and three years special parole on each, to be served consecutively to each other and the sentences previously imposed. He received an additional 15 years on each of three counts of possession of a controlled substance, together with three years special parole, two of the sentences on these counts to be served consecutively and the other concurrently. Harris was sentenced to five years and two years special parole, to be served consecutively, for an additional count of possession with intent to distribute, and four years on each of 14 counts for use of the telephone to facilitate drug trafficking, the sentences to be served concurrent with each other, but consecutive to the other sentences imposed. Harris' total sentence is 79 years.

CHARLES CRAVEN was sentenced to 10 years on both RICO counts, to be served concurrently. He received 10 years for possession of a controlled substance with intent

to distribute, to be served consecutively, and four years on each of three counts of using a telephone to facilitate drug dealing, to be served concurrently with each other, but consecutive to sentences imposed for other offenses. Craven's total sentence is 24 years.

VIOLA HOLMES was sentenced to five years on each of the RICO offenses, to be served concurrently. She received five years and three years special parole on two counts of possession with intent to distribute a controlled substance, to be served concurrently, and four years for the use of a telephone to facilitate drug dealing, the sentence to be served concurrently. Holmes' total sentence is five years.

CORNELIA G. KENNEDY, Circuit Judge (concurring in part and dissenting in part.)

I concur in Judge Edwards' opinion with the single exception that I find the evidence of the RICO "enterprise" count insufficient as to defendant Craven and would grant a verdict of acquittal as to him on that count.

MERRITT, Circuit Judge, dissenting.

This case raises difficult issues concerning the scope of the federal enterprise racketeering statute, 18 U.S.C. §§ 1961–68 (1976), as well as a number of related constitutional, evidentiary and procedural issues concerning notice and due process, the sufficiency of the evidence, the admissibility of co-conspirator hearsay, the instructions to the jury regarding multiple conspiracies and double jeopardy. As the Court suggests, the nine appellants may well be a band of modern day outlaws who have committed a host of federal and state crimes. Unfortunately, the government in its zeal to lump all their crimes into a single racketeering count for purposes of joint prosecution has failed to describe the kind of enterprise contemplated by the statute in question. Even worse, however, it has completely failed to prove the full extent of the criminal enterprise that the indictment does describe. At best the government has

proved a *common* enterprise with only one objective and only one type of illegal act—sale of narcotics—rather than the far-ranging, multi-purpose enterprise alleged. The record does not show that other crimes, such as burglary and mail fraud, were part of the overall enterprise.

## I.

After a jury trial in the United States District Court for the Southern District of Ohio, on an indictment containing 329 counts against 37 defendants, the 9 appellants—Carl Sutton, Jr., Joseph Elkins, Dyeatra Carter, Edwin Adams, Otis Hensley, Prince Albert Rankin, Samuel Harris, Charles Cravens, and Viola Holmes—were each convicted of "conducting the affairs" of an "enterprise" affecting interstate commerce "through a pattern of racketeering activity," 18 U.S.C. § 1962(c),[1] and of conspiracy to commit that offense, 18 U.S.C. § 1962(d).

The law in question was enacted as Title IX of the Organized Crime Control Act of 1970 and is popularly known as RICO, an acronym for "Racketeer Influenced and Corrupt Organizations," the heading under which it appears in the criminal code. What RICO outlaws is the corruption of an enterprise through a "pattern of racketeering activity." RICO in § 1961(5) defines a "pattern of racketeering activity" as requiring at least two predicate "racketeering" crimes[2] and in § 1961(1) defines these predicate crimes to include a long list of federal and state crimes ranging from murder, rape, robbery, burglary and fraud to narcotics and receiving stolen property.

The main constitutional, evidentiary and statutory construction questions of this ap-

peal arise from the theory of the government's case as presented in the indictment. The indictment alleges a RICO conspiracy in Count I and a RICO substantive offense in Count II. In both counts, the enterprise element of the offense is alleged not as an apparently legitimate business but rather as "being an unlawful business enterprise engaged in distribution of controlled substances, interstate transportation of stolen property, receipt of stolen property transported in interstate commerce, and mail fraud."[3] In addition, both the substantive and conspiracy counts alleged that the purposes of "the illegal enterprise" also included the "theft" of merchandise "by a network of burglars" directed by the defendant Hensley in order "to finance the purchase of" narcotics. (App. 85–87.) Thus the enterprise alleged in the indictment is a wholly "unlawful business enterprise" which engaged in burglary, fencing and fraud, as well as narcotics.

As the "pattern of racketeering" element of the offense the indictment alleges a host of crimes consistent with the "enterprise" previously alleged. The indictment alleges that the predicate crimes constituting "the pattern of racketeering activity included, but [were] not limited to the acts described in" the conspiracy count and in 101 of the substantive counts. (App. 97.) The predicate crimes alleged in the RICO count thus included specific substantive offenses involving the receipt of and transportation of stolen property (Counts 3 and 4), possession and distribution of narcotics (Counts 5 through 97) and mail fraud (Counts 123 through 130).

In addition to the RICO conspiracy and enterprise counts, each defendant was con-

---

1. 18 U.S.C. § 1962(c):

    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

2. 18 U.S.C. § 1961(5):

    "[P]attern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity . . . .

3. This definition of the enterprise is found in paragraph 2 of the conspiracy count (App.80) and is incorporated by reference in the substantive RICO count.

victed of numerous substantive narcotics counts. Two of the defendants, Adams and Hensley, were convicted of substantive stolen property and mail fraud counts. The defendants received long consecutive sentences on the two RICO offenses and the substantive offenses which constituted the RICO predicate crimes.

It was the government's theory of the case, as alleged in the indictment and argued on appeal, that these various crimes were not discrete criminal ventures but were merely separate departments of a unitary RICO "criminal enterprise" under the management and control of Sutton and Herschel Weintrub, a defendant who was not tried in the instant prosecution. Our Court has found that the evidence supports the existence of what it calls a "centrally-directed criminal enterprise" engaged in burglary, fencing, fraud and narcotics.

The evidence in the case simply does not support the government's theory or the Court's finding. Taking the proof in the light most favorable to the government, it establishes that the defendants were a chain of buyers and sellers engaged in the distribution of heroin. Carter and Elkins, located in Cleveland, were wholesalers of heroin. The proof does not show that these two Cleveland wholesalers talked or sold heroin to anyone but Sutton (another wholesaler located in Cincinnati) and his assistant, Holmes. Sutton, in turn, sold to Adams, Cravens and Rankin, and also to Weintrub. Weintrub, in turn, sold to Har-

ris and also to Adams. Adams also sold to others including, apparently, Hensley.

There is no proof that any of the defendants except four—Adams, Hensley, Harris and Weintrub—knew about or engaged in the transportation and distribution of stolen merchandise, or in making false insurance claims involving the use of the mails, or knew about Hensley's burglary operation. There is no proof whatever that six of the defendants—Elkins, Carter, Sutton, Holmes, Rankin, and Cravens—had knowledge of the stolen merchandise, burglary, fencing and mail fraud activities. There is not a word or a line in the record from which it could be inferred that these six defendants agreed, intended to conduct, or participated in any enterprise engaged in burglary, fencing and mail fraud.

The only proof in the record on Dyeatra Carter consists of two taped telephone conversations between Carter and Sutton and a handwritten record. In the taped conversation, Carter discusses what, on the surface, appears to be her exterminating business, Carter Exterminating Co.[4] The government's expert witness, however, later interprets these conversations as being related to heroin.[5] The handwritten note was found in the residence of Viola Holmes, supposedly about measurements of heroin (TR. Vol. IV pp. 3795–3797). Ex. # 41. A government expert testified that it was in the handwriting of Dyeatra Carter (TR. Vol. IV p. 3797) and that it related to the distribution of narcotics (TR. Vol. IV p. 3997–4000).

---

**4.** Gov't Exhibit 258, TR. p. 3420–24, Vol. III, a conversation between Carl Sutton and Dyeatra Carter:

DC "Then I just go on, do you have an idea of, you know, like a, a, let's see we just got a new shipment of spray.
CS Uh huh.
DC And do you have any idea how many, a gallons after the, you know, to hold for you.
    *   *   *   *   *   *
DC Right, do you have any idea about how many gallons, you know, you'd like to order?
CS About 10.
DC Ok, well then I'll I'll hold a 10 gallons for you until you get here, or until we we mix it, cause I won't be down that way until the middle of December."

**5.** TR. p. 3949–50, Vol. IV:

The government expert witness interpreted the conversations as follows:
Mr. Steinberg: "Now, in that conversation, Mr. Stuart, do you have an opinion as to what the term "a new shipment of spray" means?
The Witness: Sir, in my opinion, that means heroin.
    *   *   *   *   *   *
Mr. Steinberg: And in the same conversation, do you have an opinion as to what the term "gallons" means in the statement by Dyeatra Carter when she says, "How many gallons would you like to order?"
    *   *   *   *   *   *
The Witness: "Sir, in my opinion, Miss Carter there is referring to ounces of heroin."

The government's proof on Joseph Elkins consists mainly of two taped conversations with Sutton, one in which he discusses opening up a business and another in which he discusses "roach spray." [6]

The proof on Cravens consists of taped telephone conversations between him and Sutton, a search (TR. Vol. IV p. 3560) of his home which turned up bags containing heroin (TR. Vol. IV p. 3878), quinine and lactose and a note pad with passages related to narcotics sales.[7] (TR. Vol. IV p. 3993). There is no evidence connecting him to anyone other than Sutton or any crimes other than narcotics.

The proof on Viola Holmes, Sutton's associate, is likewise scanty. A search of her home turned up a motel receipt, a cashier's check for $1000 made payable to Dyeatra Carter, an address book and a McDonald's spoon (TR. pp. 3730–3736 Vol. IV). There were also several taped telephone conversations which mainly consisted of "Hi, how are you?" In one conversation with Collins Jones, another alleged conspirator, Holmes, referring to Carl Sutton, tells Jones, "Well, he told me, he gave me a message .... And that was that if you called to just tell you to come on and bring it, give it to me." (TR. Vol. III, p. 3376.)

The proof on Edwin Adams demonstrates he was involved in narcotics,[8] insurance fraud [9] and dealing in stolen goods.[10] The

6. Gov't Ex. # 258, pp. 3444–3447 Vol. III:
   JE "I, I don't, I think we were supposed to ship you that spray before. That glass case you were supposed to get, uh, four cases.
   CS Uh huh.
   JE We still owe ya 4.
   \* \* \* \* \* \*
   JE And you need 10 more.
   Gov. Interpretation: The Witness: "Yes, sir. That spray in my opinion means heroin."
   \* \* \* \* \* \*
   By Mr. Steinberg: "Q. And in his next statement, That glass case, you were supposed to get, a four cases, do you have an opinion as to what the term glass case refers to?" The Witness: "Sir, again it is conversation regarding a shipment of heroin."

7. The Government expert testified as to what the note pad contained:
   Q. Mr. Stuart, with respect to the book found in the apartment of Mr. Craven, have you noted certain passages which in your opinion relate to narcotics transactions?
   A. Yes, sir, I have.
   Q. Now, can you take each page at a time and read a particular passage that you believe so relates and explain how it relates?
   A. Yes, sir. At the top of the pages marked January 5, the first line says "Paid 1100 or 1200" .... The next line has the numeral 1 and the letter Z. The next line has 3TP, 2TP at first, then 1 TP. The next line is a column of numbers, and it has 200, 150, 200, 120. These are added together to arrive at a total of 670.
   Beneath that is the number 100 with a notation directly to the right which says "To go with D," and then there is a line and the 100 is subtracted from the 670 to equal 570. There is another notation in the lower right-hand corner where it says 1100, and beneath that 100, and they are added together for a total of 1200.

\* \* \* \* \* \*

The figure 12 in my opinion represents one ounce of heroin.
The figure 3TP, 2TP and 1TP represent tablespoons. TP in my opinion means tablespoon. TR. 3993–94.

8. Telephone conversation between Adams and Herschel Weintrub (TR. Vol. II p. 1191, 1192):
   EA "What we'll have to do, is, ah, we'll have to get together, now, be sure and give me some lack, ok? Then we'll step on it. We'll make one table up. See, he's used to this. See, well, well, the last deal that we made with him ...
   HW Yeah.
   EA Instead of taking one and making four, we took one and made two, see, at 3 and a quarter apiece. Now he's taking 2 ozs, so that would be that we'd take one oz and make 2 ozs."

9. Telephone conversation between Adams and Charles Combs (TR. Vol. I, p. 1842):
   EA "This morning and forgot about it cause, you know, I was all jammed up ... you got any old invoices from Lebanon?
   CC Yeah.
   EA Ah, any chance of getting a couple of em for a Sony TV and a Sony tape recorder, ah, a neighbor of mine had ripped off, he can't find the receipts to save his ass?
   CC Yeah, I have a few.
   EA Ok, when can he get em?
   CC Ah, let me see.
   EA Insurance man been bugging the shit out of him.
   CC Yeah, I know, backdate it? Now, I've got the ...

10. Telephone conversation with Herschel Weintrub (TR. Vol. II, p. 1642):
    EA "Yeh, get out of this God damn robbing business. I'll tell you I'm so God damn sick

proof on Adams consisted of numerous taped telephone conversations, mainly with Herschel Weintrub, and a purchase by government agents (TR. Vol. I p. 177).

The proof on Otis Hensley shows he was involved in defrauding an insurance company using the mail,[11] dealing in stolen

goods[12] and narcotics.[13]  There were taped telephone conversations with Adams and Weintrub and a purchase of drugs by a government agent (TR. Vol. I pp. 398–412).

The proof on Sam Harris consists of taped telephone conversations concerning stolen goods[14] and narcotics.[15]

of fencing merchandise, it's, you wouldn't believe."

11. Telephone Conversation between Otis Hensley and Herschel Weintrub (TR. Vol. II pp. 1817, 1818):

OH  No, I'm not kidding you, and to collect off anything that was taken I gotta have receipts.
HW  Yeh.
OH  Can you cover anything?
HW  Such as what?
OH  Well, say like small stuff typewriters, binoculars, anything like that?
HW  Ah yea, I can ah well I don't carry those things any more, and if you say that you bought them too long ago they would have depreciated way down.
OH  Well, how long ago?
HW  I really quit carrying them about four years ago.
OH  Oh.
HW  But I can ah you know like a typewriter up till last year or something.
OH  Yea.
HW  It's according to what make now. You'd have to tell me the make and the price. Are you gonna be home?
OH  Now you mean?
HW  Yea cause I've got to cooperate with insurance companies.
OH  Well, he told me, I talked to the adjuster a while ago. He's coming Friday. Now these people are kind of different. Now he told me to go ahead and he said anything I could come up with receipts on right off the bat he said he'd go ahead and take care of.
HW  Yea
OH  But he said anything else we'd have to try to make a settlement on.
HW  OK, I can give you receipts from my old cash register.
OH  Yeh, well . . .
HW  But you'll have to ah you know you can't do it on a new piece of paper ah . . .
OH  What I was thinking though couldn't you just see I told him that they got my box, my filing cabinet like thing with most of my receipts and canceled checks in it. Couldn't you just make a copy of something down there, and I don't believe he'll come around. I think he might just call.

12. Telephone Conversation between Otis Hensley and Charles Thomas Hill, a severed defendant. TR. Vol. II p. 1443:

CTH  . . . so I was thinking if he wants to give $150 . . .

OH  For what, the Browning?
CTH  Yeh, that's worth it, isn't it?
OH  Hell, he was selling to Jay for $125, $135.
CTH  Yeh, well, I think he was au . . .
OH  He might give it to ya for it, I don't know.
CTH  I don't know if he can even use em. I was just thinking if see you can get that, if he, see, you can get ah, see Leonard doesn't need any money right now, Jimmy does and I do.
OH  Well.
CTH  So we can au, I'm trying to think who I knew to sell em to, you know. Maybe we can come out with more money, you know. We can still come out ahead.
OH  Well, I, that one guy asked me what I'd take for the Model 10 and the Browning by theirself, but hell, that's the two guns.
CTH  Tell him, yeh, that's a well, we have to have at least two hundred or two and a quarter, wouldn't we?
OH  Yeh.
CTH  $225.
OH  Those are your two best guns there.
CTH  Yes, you can only figure about $40 or $50 on that 37. And the same on the other one.
OH  $40 or $50 on a 37.

13. Telephone conversation between Herschel Weintrub and Otis Hensley (TR. Vol. II, p. 1555). Ex. # 231.

HW  "I just want to know what you could opt for em. I don't want any profit above what you pay for it.
OH  Yeh, well, anywhere from $350 to $375 probably.
HW  That's all.
OH  It depends. Yeh, that's about all I can get.
HW  Even if you broke it down?
OH  Well, I don't know.
HW  You know, T's or half T's or something."

14. Telephone conversations between Herschel Weintrub and Sam Harris (TR. Vol. III, pp. 3889, 2890):

SH  I'm out stealin spare tires out of new cars.
HW  Ha, ha, you're doin what?
SH  Yeh, you heard it.
HW  Say that again.

The government's proof on Carl Sutton consists of numerous taped telephone conversations with people such as Rankin, Cravins, Carter, Adams and Weintrub, along with the government's interpretations of those conversations. A typical telephone conversation was replete with narcotic phraseology.[16] The searches of Sutton's person and car turned up "spoons" and a "mortar and pestle" showing traces of heroin.

Sutton is alleged to be the leader and managing partner of this RICO enterprise. He was under surveillance and his telephones were tapped for several weeks; yet there is not a single line of testimony, not a single document, not a single tape-recorded conversation introduced in the government's case from which one could legitimately infer that as the managing partner of the enterprise he engaged in, directed,

suggested, profited from, or financed the stolen property, burglary and fraud crimes perpetrated by Adams, Hensley and Weintrub. Sutton was concerned only with the distribution of narcotics.

Likewise, there is simply *no evidence* in this record to show that Elkins, Carter, Sutton, Holmes, Cravens or Rankin delegated any authority to Adams, Hensley and Weintrub to commit these crimes. The burglary, stolen merchandise and mail fraud crimes were discrete criminal ventures, carried on by Adams, Hensley, Weintrub and Harris, unconnected with the narcotics enterprise.

In Section II. of the majority opinion, entitled "The Indictment and the 'Enterprise' Proofs," a section written after this dissent was circulated, the Court attempts to marshall evidence on the sufficiency is-

> SH  Rippin off spare tires on new cars.
> HW  Ha.
> SH  I try *em out and take the spare.*

15. Telephone conversation between Sam Harris and Herschel Weintrub (TR. Vol. II, p. 2037)

> SH  You remember tha, ah, glue that I was using to set them stones with, it keeps, ah, you know, like, ah, jelling up like jello.
> HW  Yeah.
> SH  Do you have any idea what might cause that?
> HW  No, is that what it's doing?
> SH  Yeah, and, ah, you can't get it, you know, *to the mounting in time, ah, before it jells up.*

The government's interpretation of this conversation is as follows: (TR. Vol. II, pp. 2058, 2059)

> The Witness: Exhibit 223–B is a call from Herschel Weintrub's residence to the Essex House where he speaks to Commodore Perry Harrison, and it is related to the call we heard previously between Herschel Weintrub and Sam Harris where Sam Harris states that the glue he was using to set the stones kept, you know, jelling up like jello. In my opinion, what he is stating there is the people using the heroin that he has been selling are having a problem getting it to cook up properly, so they are unable to draw it from the spoon in which they cook it up into the syringe, so they are unable to inject it into their arm."

16. Government Ex. # 226, pp. 2208–2216, Vol. III, p. 2211:

> HW  Ok, *now I talked to Sam, he's got problems.*
> CS  Oh

> HW  He's got 5 customers that just left. It just won't come through. I told him how Eddie used it and everything else and they can't so, but I thought, have you got anything made?
> CS  No
> HW  If we gave em, not give em, sell em one
> CS  Ah-huh
> HW  Mix it with one, you follow me?
>
> \*     \*     \*     \*     \*     \*
>
> p. 2210
> HW  Did they go up?
> CS  No, no nothing like that. They would only give like 1 for that.

The Government's interpretation by their expert witness:

> p. 2287.
> A.  Sir, there were numerous discussions prior to this call shown in Exhibit 226–E in which bad heroin was discussed, ... and later in the same conversation they discuss how much money they got for it which Carl Sutton says they got one, and in my opinion he meant one thousand, and Herschel Weintrub seemed to be upset that they didn't get 1200.
>
> \*     \*     \*     \*     \*     \*
>
> A.  Sam Harris still had part of that bad heroin, yes, sir. I said in my opinion that it *was an ounce package to begin with that was bad.* Some of it was sent to Eddie Lawwill, some of it was sent to Sam Harris, and the remainder of that package I feel was returned to the source of supply on this particular day.

sue. With respect to Carter and Elkins, the Court implicitly concedes that there is no evidence connecting them to any fencing, burglary and insurance mail fraud crimes. The Court does not point to any evidence suggesting that they even had knowledge of the existence of these crimes. Yet the Court is willing to convict them and let them go to jail for prison terms exceeding 80 years for engaging in the business of fencing, burglary and insurance fraud. I do not understand why, and the Court offers no explanation.

On the defendant Sutton, the so-called "managing partner" of this "centrally-directed" "unlawful criminal enterprise engaged in fencing, insurance fraud and burglary as well as narcotics," the Court at least makes an effort to recount evidence to justify the RICO conviction. That effort is unconvincing.

The first bit of evidence adduced is a series of pictures of Sutton and Weintrub together with a gold box. This proves nothing except that they associated together and possessed a gold box. We do not know what was in the gold box. The gold box is never connected with anything. This proof hardly permits an inference, as the Court claims, that Sutton ran a burglary, fencing and insurance fraud operation financed by Weintrub. Much better proof of the association between Sutton and Weintrub comes from the voluminous, tape recorded, tapped telephone conversations between the two about narcotics. During all of these many conversations, however, there is but one unclear reference to merchandise other than narcotics. There is one reference to some "watches." That is all. We do not know what connection Sutton had to the watches, if any, or whether they were stolen. Is it reasonable to infer from that one item the conclusion that Sutton directed a fencing, burglary and insurance fraud operation financed by Weintrub? I think not.

As additional proof the Court cites and quotes at length in the addendum from a tapped telephone conversation in which Sutton offers to help Rankin fix his broken stereo set. But there is no proof the set was stolen or connected with any fencing, burglary or insurance fraud operation.

There is, as the Court suggests, one item of testimony from which one could perhaps infer that Sutton knew about and participated in the fencing of stolen property, but that item of proof was developed on cross examination of Sutton's associate, Holmes, when she took the stand in her own defense. That testimony is as follows:

Q. Now do you know whether or not Carl Sutton ever sold rings or watches?

A. Yes.

Q. Did you all discuss this?

A. Not a great deal, but I knew that he sold rings and watches, jewelry for Herschel Weintrub.

Q. Now, in connection with his selling of jewelry or selling of furniture, did you on any occasion collect any money for him?

A. Yes.

There are several problems with this testimony. The witness, Holmes, who gave the testimony claimed the jewelry was legitimate. No effort is made to prove that this jewelry was stolen, and we cannot simply assume that it was. Weintrub sold a lot of jewelry (he ran a jewelry store) that was not stolen. Even if we assume, however, that the jewelry was stolen, it does not help the Court's argument because this proof came in after the government closed its case. This evidence, developed during another defendant's proof, cannot be used to shore up the government's case in chief against Sutton. Sutton made a *motion for judgment of acquittal* on the basis of the sufficiency of the evidence at the end of the government's case, and that motion should have been granted. He did not take the stand or offer proof; he, therefore, did not waive his motion based on the insufficiency of the government's case in chief. The law is clear that in such circumstances the later proof cannot be taken into account when an appellate court rules on the sufficiency of the government's case. *See* F.R.Crim.P.

29(a); *United States v. Calderon*, 348 U.S. 160, 164 n.1, 75 S.Ct. 186, 188, n.1, 99 L.Ed. 202 (1954); *United States v. Black*, 525 F.2d 668, 669 (6th Cir. 1975).

Even if we accept the Court's argument that the government proved that Sutton knew about, participated in and directed a fencing operation—a conclusion that seems contrived and without factual support to me—where is the evidence that he knew of, participated in and managed a "centrally-directed criminal enterprise engaged in burglary and insurance fraud"? The Court makes no effort at all to connect him to these criminal ventures. No evidence is marshalled or mentioned to show that he directed a burglary and insurance fraud enterprise.

## II.

On these facts, the District Court committed four errors which in my view require reversal.

**1. Variance Between the Indictment and the Proof.**—The indictment alleged a conglomerate or multi-purpose criminal enterprise engaged in narcotics, burglary, fencing and fraud. The proof showed at most a narcotics distribution conspiracy. This variance is material, and the District Court should have granted the defendants' motions for acquittal on the two RICO counts at the end of the government's proof for this reason. To illustrate the problem in a different context, suppose the government charges a RICO enterprise engaged in murder, robbery and extortion but proves only an enterprise engaged in extortion or robbery and extortion. Under such circumstances the proof is insufficient to prove the crime charged, and the defendants must be acquitted.

The reason for this is that in our legal system the government must prove the crime charged in the indictment. Due process and the Fifth Amendment provision that "[n]o person shall be held to answer ... unless on a presentment or indictment of a Grand Jury" provide this right even for dealers in narcotics. Our adversary system of criminal justice requires that the contestants persuade, and the judge instruct, twelve minds to return a unanimous verdict beyond a reasonable doubt after an intense battle in a formal setting. Our system can only maintain clarity and self-discipline and avoid confusion by rigorously enforcing the notice requirement, especially in an era when multiple, complex offenses are the norm.[17] Otherwise, the government can charge a conspiracy or an enterprise engaged in the commission of a multitude of major and minor crimes without knowing in advance what it can prove in the hope that it can prove something. The defendant will not know how to go about defending himself. The jury will not know precisely what combination of facts it is supposed to find in order to convict. If the jury convicts, the sentencing judge will not know what particular crime the jury found.[18] In order for the adversary system to work effectively, the issues in criminal jury trials therefore must be kept clear and succinct.

This fundamental principle of criminal law has many times been repeated and applied by the Supreme Court. In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the variance was less material than here. The indictment charged extortionate interference under the Hobbs Act with goods flowing into the victim's plant. The proof showed that the interference occurred after the manufactured product left the plant. Justice Black, writing for a unanimous Court, reversed

---

17. At common law, the doctrine of election of offenses prevented the trial of multiple overlapping charges too complex for the jury to understand. See Friedland, DOUBLE JEOPARDY 170–84 (1969): "The rule [requiring election of offenses] had the effect of confining the jury's attention to a relatively simple issue." Id. at 180.

18. These are the considerations discussed in Supreme Court opinions on the subject of variance between the indictment and the proof. *See Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962); *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960); *Kotteakos v. United States*, 328 U.S. 750, 769–70, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946).

the conviction on the basis of the ruling in *Ex parte Bain*, 121 U.S. 1, 10, 7 S.Ct. 781, 786, 30 L.Ed. 849 (1887):

> In that case, the court ordered that some specific and relevant allegations the grand jury had charged be stricken from the indictment so that Bain might be convicted without proof of those particular allegations. In holding that this could not be done, Mr. Justice Miller, speaking for the Court, said:
>
>> "If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed."
>
> 361 U.S. at 216, 80 S.Ct. at 272. (footnote omitted).

In *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Supreme Court had made the same basic point. It reversed convictions because the evidence showed multiple conspiracies rather than the one alleged in the indictment. In a long and passionate opinion, Justice Rutledge, speaking for the Court, discusses the considerations involved and the injustice that a contrary principle would allow. "Criminal they may be," he concludes, but our system is not one of "mere convenience or efficiency" and we must not allow ourselves to "become careless or complacent when that fashion has become rampant over the earth" for in "[t]hat way lies the drift toward totalitarian institutions." 328 U.S. at 773, 66 S.Ct. at 1252.

This Court up until now has consistently enforced this same basic principle in conspiracy cases: "Where one conspiracy is specifically charged, proof of different and disconnected ones will not sustain a conviction." *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973). There Judge McAlister explained that "[t]o allege against a number of persons generally that they have conspired . . . does not enable the prosecution to prove several conspiracies each affecting . . . different persons or groups of persons . . . unless . . . the wrong purposes . . . form parts of the same combination." Judge McAlister's reasoning is based expressly on Judge Learned Hand's analysis of conspiracy in *United States v. Peoni*, 100 F.2d 401 (2nd Cir. 1938), and in *United States v. Falcone*, 109 F.2d 579 (2nd Cir.) *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). In *Peoni* Judge Hand concluded: "Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it." 100 F.2d at 403. Judge McAlister in *Bostic*, quoting Judge Hand in *Falcone*, warned that "many prosecutors seek to sweep within the drag-net of conspiracy all those who have been associated in any degree whatever with the main offenders," and that "there are opportunities of great oppression" in such prosecutions. 480 F.2d at 968 *quoting* 109 F.2d at 581.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court, applying a similar principle, recently explained the meaning of the requirement that the proof must show beyond a reasonable doubt the material facts charged in the indictment. Noting that "a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process" and that under our system "even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglary," the Supreme Court said that when the question is one of the sufficiency of the evidence, "the critical inquiry on review" is not "whether the jury was properly instructed" but "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt" of the crime charged. *Id.* at 2786, 2789, 2792.

Applying these standards to the facts of the instant case, it is clear that the government did not prove the enterprise agree-

ment charged in Counts I and II of the indictment. In its brief at page 79 the Government concedes that it must prove the enterprise agreement charged in the indictment. Here the proof does not support such a finding. The Record shows at least four distinct conspiracies: (1) narcotics, (2) burglary, (3) fencing and (4) mail fraud. These conspiracies involve different people, different goals, and different overt acts. Without severance or special limiting instructions, prejudice was inevitable. As a reviewing court we cannot now disentangle the proof and maintain that defendants received a fair trial. New trials are necessary. *See United States v. Reynolds*, 489 F.2d 4, 6 (6th Cir. 1973), *cert. denied*, 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974).

2. **Co-Conspirator Hearsay.**—The evidence of the burglary, fencing and fraud crimes committed by Adams, Hensley and Weintrub was admitted against all the other defendants under the exception to the hearsay rules permitting "oral or written assertions or nonverbal conduct" by a "co-conspirator of a party during the course and in furtherance of the conspiracy." Fed.R. of Evid. 801. Under this exception, all of the telephone conversations among Adams, Hensley and Weintrub about burglary, fencing and fraud were admitted against all the other defendants. In addition the District Court admitted against all defendants documentary evidence in the form of false insurance claims filed by Hensley, inventory records of stolen property maintained by Adams and Weintrub, as well as their nonverbal conduct showing possession and distribution of a large volume of stolen merchandise. Even real evidence in the form of "hot" stoves and other household merchandise, or descriptions and photographs thereof, were admitted against Elkins, Carter, Sutton and the rest even though there is no proof, hearsay or otherwise, that they ever heard of the merchandise, knew of these crimes or authorized their commission.

The admission of all this evidence against the other defendants was clear error under *United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974),

and *United States v. Hoffa*, 349 F.2d 20, 41–42 (6th Cir. 1965), *aff'd on other grounds*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The District Court did not require the government to establish by independent evidence the existence of the alleged conspiracy before admitting the hearsay for consideration by the jury. Nor did the court require the government to establish that the hearsay evidence occurred during the course and in furtherance of the conspiracy alleged in the indictment. The defendants objected to the evidence, but the District Court overruled their objections without explanation. (TR. 188–89, 4172). In addition, the District Court failed to make the findings of fact or follow the procedures required prior to the admission of co-conspirator hearsay by the recent decisions of this Court in *United States v. Enright*, 579 F.2d 980 (1978), and *United States v. Vinson*, 606 F.2d 149 (1979).

The dangers of this kind of evidence, even when the rules of admissibility are satisfied, are well known. See *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) (Blackmun, J.); *Kotteakos v. United States*, 328 U.S. 750, 770–71, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946); *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973); Levie, *Hearsay and Conspiracy*, 52 Mich.L.Rev. 1159 (1954); Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis*, 85 Harv.L. Rev. 1378 (1972). Here, however, the problem with the evidence is not that it is necessarily unreliable as proof that the declarant or actor committed the property crimes in question. It is simply irrelevant until it is connected to the defendant against whom it is admitted. By admitting the evidence against the defendant, the judge implicitly tells the jury that it may rationally find that the connection has been made. Since the connection was never made, the District Court committed reversible error by admitting this kind of evidence against defendants who had no relationship to it.

**3. The Jury Instructions.**—The District Court allowed the jury verdict to stand and admitted the hearsay because of its theory that the jury could return a verdict of guilty against a defendant by simply finding that he participated in any one of the five conspiracies. It instructed the jury to this effect:

> Although the indictment charges a single conspiracy, it would be possible for you to find the following separate conspiracies: A conspiracy to engage in a racketeering enterprise; A conspiracy to engage in distribution of controlled substances; A conspiracy to engage in interstate transportation of stolen property; A conspiracy to engage in receipt of stolen property transported in interstate commerce; or A conspiracy to engage in mail fraud. Whether there was one conspiracy, five conspiracies, or no conspiracy at all is a fact for you to determine from the evidence. (TR. pp. 6099–6100, Vol. VI.)

The District Court then advised the jury that it had "previously instructed" the jury as to the statements of co-conspirators. *Id.* at 6100. The Court then says that the jury "may not consider any such act or statements against" another defendant unless the jury finds "that the person doing the act or making the statement was a member of the same conspiracy as was such defendant." *Id.* Thus the Court allowed the jury to decide what conspiracy each defendant was involved in and what hearsay to consider.

This instruction was carefully written down and handed to the jury before the Court's charge was given. The District Court asked the jury to read the instruction as he gave it orally and to take the written instructions to the jury room when they retired to consider their verdict. The charge was not inadvertent, as the majority ingenuously suggests. It was not given by mistake. It embodied the District Court's theory of the case.

The defendants specifically objected to the instruction before it was given and then again after it was given. Counsel for the defendant submitted and then resubmitted a correct instruction which said that "to find a defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other conspiracy." [19] The District Court repeatedly rejected this charge in favor of the one allowing conviction of a defendant if he participated in any one of five conspiracies. The District Court never instructed the jury that in order to convict it must find the defendant guilty of a conspiracy or enterprise agreement of the scope alleged in the indictment. This was error.

**4. Double Jeopardy.**—Under the Court's interpretation of RICO, problems of double jeopardy under the "same evidence" or

---

**19.** The defendants proposed a correct instruction which said:

> The indictment in this case charges there was a single, overall conspiracy, by and between the various defendants and others, to conduct and to participate in an illegal racketeering enterprise that had as its goals the following specifically enumerating purposes: (1) the interstate transportation of stolen property; (2) the distribution of controlled substances; (3) the receipt of stolen property transported in interstate commerce; and (4) mail fraud.
>
> Now it is the law that proof of several conspiracies, or even proof of a different conspiracy, is not proof of a single overall conspiracy charged in an indictment unless one of the several conspiracies is also the single conspiracy which the indictment charges. This being so, the jury must first determine whether the conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed then you must acquit all of the defendants on the conspiracy charge. However, if you are satisfied that the charged conspiracy actually existed, you must then determine who were the members of that conspiracy.
>
> If you determine that a particular defendant was not a member of any conspiracy, or was the member of a conspiracy other than the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty, you must find that he was a member of the conspiracy charged in the indictment and not some other conspiracy.
>
> (App. 6099 and Addendum to Reply Brief of Elkins and Carter filed September 25, 1978.)

*Blockburger* test [20] are acute. For example, the defendant Elkins received a sentence of 82 years' imprisonment. The 82-year term consists of consecutive sentences of 20 years on the RICO conspiracy, 20 years on the RICO substantive offense, 15 years on the narcotics distribution substantive offense, 15 years on the narcotics possession substantive offense, and 4 years on each of 3 offenses involving use of a telephone to facilitate the drug offenses. The other defendants received similar sentences.

There is little logic to the Court's position that the RICO conspiracy offense merges into the RICO substantive offenses, thereby preventing multiple punishments, while the RICO predicate offenses, e. g., the substantive narcotics counts, do not merge. All of the substantive narcotics distribution, possession, mail fraud, and stolen property offenses are part of the series of predicate crimes which constitute the "pattern of racketeering activity" element of the RICO substantive offense, just as the RICO conspiracy—the agreement to commit this pattern of crimes—constitutes the enterprise element of the crime under the Court's interpretation. Under the Court's interpretation, RICO becomes just another way to punish the predicate crimes.

Proof of a RICO violation necessarily is proof of the underlying "pattern" crimes; if the "pattern" crimes cannot be proved, there is no RICO violation.[21] Defendants are punished once under RICO for committing the "pattern" crimes. They cannot be punished again with consecutive sentences or additional fines, for commission of these same offenses that both define the enterprise and constitute the alleged pattern of racketeering activity.[22] *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

Under the Court's interpretation of RICO, it is necessary, therefore, to instruct the District Court to reduce the fines and sentences of the defendants so that no defendant suffers any additional punishment by virtue of the predicate offense convictions.

### III.

I have already set out at length in the panel opinion in this case and will not re-

---

**20.** *See Blockburger v. U. S.,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *Gavieres v. U.S.,* 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489 (1911). Under the *Blockburger* test, a "single act may be an offense against two statutes" only if "each statute requires proof of an additional fact which the other does not." If proof of the elements of one crime necessarily and fully proves the elements of another, the principal and constituent offenses are regarded as the "same offense" for Double Jeopardy purposes. *Illinois v. Vitale,* 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); *Brown v. Ohio,* 432 U.S. 161, 165–66, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). *See* Note, *The Double Jeopardy Clause as a Bar to Reintroducing Evidence,* 89 Yale L.J. 962, 965–67 (1980). Because the Double Jeopardy clause "protects against multiple punishments for the same offense," *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (dicta); *Ex Parte Lange,* 85 U.S. (18 Wall.) 163, 168, 21 L.Ed. 872 (1873), only one of these offenses may be punished.

**21.** The *Blockburger* test "emphasizes the elements of the [various] crimes. *Brown v. Ohio,* 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). It lays two offenses side-by-side, and compares the provisions of "each statute." Thus the *Blockburger* test matches the provisions of 18 U.S.C. § 2314 (interstate transportation of stolen property) with 18 U.S.C. § 1962(c) (RICO). Likewise, it compares 18 U.S.C. § 2315 (receipt of stolen property) to 18 U.S.C. § 1962(c); 21 U.S.C. § 841(a)(1) (possession of a controlled substance with intent to distribute) with 18 U.S.C. § 1962(c); 21 U.S.C. § 841(a)(1) (distribution of controlled substances) with 18 U.S.C. § 1962(c); and 18 U.S.C. § 1341 (mail fraud) with 18 U.S.C. § 1962(c). By its terms, then, the *Blockburger* test contemplates a particularized, statute-by-statute, offense-by-offense analysis. It does not call for a comparison of the entire alleged pattern of racketeering activity, collectively, to RICO; instead, each predicate offense is compared individually and separately to RICO in order to determine whether *the RICO conviction and sentence preclude any* consecutive sentencing on the constituent crimes. In this way, the *Blockburger* test seeks to assure that a particular crime is punished only once.

**22.** *Cf. In re Neilson,* 131 U.S. 176, 95 S.Ct. 672, 33 L.Ed. 118 (1889) (*conviction for crime having* several elements precludes subsequent trial or additional punishment for a lesser-included offense consisting solely of one or more elements of the crime for which convicted).

peat here my own views concerning the proper interpretation of the enterprise element of the RICO statute. In my view the language, structure and legislative history of the statute require as an element of the offense the use of an apparently legitimate enterprise, not just a wholly criminal enterprise.[23] The Supreme Court in dicta in *Iannelli v. United States*,[24] the Senate Judiciary Committee in its reports on both RICO[25] and the proposed Federal Criminal Code,[26] which incorporates RICO, and the House Judiciary Committee[27] in its report on RICO have said flatly that the legislative purpose of RICO is to stop the infiltration of apparently *legitimate* businesses by racketeers. The "pattern of racketeering activity" should therefore facilitate the conduct of an apparently legitimate business. Unless an individual or group (1) "conducts the affairs," (2) "of an [apparently legitimate] enterprise," (3) "through" a series of predicate crimes which further the business of the enterprise, there is no RICO offense under § 1962(c).

That was not the government's theory of the case at trial or on appeal, as government counsel readily conceded in its briefs and at oral argument. The government concedes that the RICO enterprise is a wholly "unlawful business enterprise" and not the insurance company which was defrauded or the jewelry stores or the exterminating company as the Court argues in the alternative. The Court's opinion misleads the reader about this matter. On the one hand it accepts the government's position that a wholly criminal enterprise is sufficient. On the other hand, it makes it appear that the government contends, and that the facts support the contention, that these legitimate organizations constitute

the enterprise through which the defendants conducted a pattern of racketeering activity. Neither the government nor the lower court takes that position. Again the Court in its alternative argument has amended the indictment to suit its own convenience, the practice that the Supreme Court disapproved in *Ex Parte Bain* and *Stirone, supra*, and again unanimously last year in *United States v. Dunn*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979) (Marshall, J.).

The Court's repeated efforts to amend the indictment arise from its failure to define clearly the elements of the offense in question. Under the Court's interpretation, the RICO *conspiracy* offense appears to have only two elements: (a) an agreement by two individuals to (b) commit any two predicate crimes. Under the court's interpretation, the RICO *substantive* offense has only one element—the commission by one individual of any two predicate crimes. The Court has not required the government to prove the existence of any unifying enterprise or any unifying agreement to conduct an enterprise because it has read the enterprise requirement out of the statute. All it has required is a "pattern of racketeering activity," *i. e.*, any two or more predicate crimes, no matter how disparate and unconnected. Only the last four words of the statute—"pattern of racketeering activity"—are given any meaning. The other words of the statute which Congress intended to mean something—whoever "*conducts* the *affairs* of an *enterprise through*"—are simply read out of the statute.

Thus the Court concludes that the racketeering activity and the enterprise elements are the same thing. Under the Court's

---

**23.** *See United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979), for a more detailed analysis of the statute and its legislative history, as well as for a discussion of the effect at a new trial of the misjoinder of the parties in the RICO counts.

**24.** 420 U.S. 770, 787 n. 19, 95 S.Ct. 1284, 1294, 43 L.Ed.2d 616 (1975). (RICO "seeks to prevent the infiltration of legitimate business operations").

**25.** RICO "has as its purpose the elimination of the infiltration of . . . *legitimate* organizations operating in interstate commerce," S.Rep.No. 617, 91st Cong. 1st Sess. 76 (1969).

**26.** RICO prohibits the "infiltration of *legitimate* business," Report on Criminal Code Reform Act, S.Rep.No. 95–605, 95th Cong. 1st Sess. 767 (1977).

**27.** H.Rep.No.1549, 91st Cong. 2nd Sess. (1970), U.S.Code Cong. & Admin.News 1970, p. 4007.

interpretation, an individual who buys or sells a bag of marijuana on two occasions or commits any other two predicate crimes violates RICO. The two crimes themselves constitute the "enterprise" and the "affairs" and the "conducting." Having read these words out of the statute, the word "through" must also be read out of the statute because there is nothing for the predicate crimes to further, facilitate or connect with, except the crimes themselves. As read by the Court the statute says: "Whoever conducts a pattern of racketeering activity through a pattern of racketeering activity," is guilty; or, eliminating the redundancy, "whoever commits two predicate crimes" is guilty.

When the enterprise element is read out of the RICO substantive offense, the enterprise *agreement* element inevitably is read out of the RICO conspiracy offense as well. All that is necessary is an agreement to commit any two predicate offenses. There is a great risk of erroneous convictions and multiple punishments for the same offense when we join this interpretation of RICO with conspiracy theory, the co-conspirator hearsay exceptions and the difficulties which are inherent in the concept of double jeopardy. It is the Court's failure to give meaning to each of the words used in the statute and to define and elaborate the elements of the statute as reflected in its legislative history that has led the Court into a series of serious constitutional, procedural and evidentiary errors.

There is now a clear conflict in the Circuits on this RICO, statutory construction issue. The First[28] and Eighth Circuits[29] have recently agreed with the reasoning of our panel opinion in this case and disagreed with the contrary construction given the statute by the Second,[30] Fourth,[31] Fifth,[32] Seventh,[33] and Ninth Circuits[34] and our Circuit in this case. Judges from the Second, Seventh and Ninth Circuits have recently filed opinions strongly dissenting from the position of those Circuits. There is strong conflict not only among the Circuits but strongly held differences exist among individual judges within the Circuits.

The number of RICO prosecutions is rising rapidly. There is a "need for certainty in the workaday world of conducting criminal trials." *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (Blackmun, J.). The courts of appeal have performed their assigned function, and the issue now awaits authoritative resolution by the Supreme Court.

---

**28.** *United States v. Turkette*, 632 F.2d 896 (1980).

**29.** *United States v. Anderson*, 626 F.2d 1358 (1980).

**30.** *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976) (VanGraafiland, J., dissenting).

**31.** *United States v. Whitehead*, 618 F.2d 523 (1980).

**32.** *United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979), *cert. denied* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980); *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

**33.** *United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979) (Swygert, J. dissenting), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

**34.** *United States v. Rone*, 598 F.2d 564 (9th Cir. 1979) (Ely, J. dissenting), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).